ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,

v.

Douglas M. COSTLE, Administrator, Environmental Protection Agency, Respondent,

Ciba-Geigy Corporation, Intervenor.

FLORIDA CITRUS MUTUAL, Petitioner,

v.

Douglas M. COSTLE, Administrator, Environmental Protection Agency, Respondent.

Nos. 79–1971, 79–2133.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 April 1980.

Decided 17 July 1980.

Rehearing Denied 18 Aug. 1980.

Douglas V. Rigler, Washington, D. C., with whom Michael Fischer, William A. Butler and Jacqueline M. Warren, Washington, D. C., were on the brief for petitioner in No. 79-1971.

J. Hardin Peterson, Jr., Lake Wales, Fla., with whom William Amory Underhill, Washington, D. C., was on the brief for petitioner in No. 79–2133. Monterey Campbell, II, Bartow, Fla., also entered an appearance for petitioner in No. 79–2133.

David E. Menotti, Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C., of the Bar of the Court of Appeals of New York, Pro hac vice by Special Leave of Court, with whom Michael S. Winer, Deputy Associate Gen. Counsel, Mitchell H. Bernstein, Gen. Atty., Environmental Protection Agency, Washington, D. C., were on the brief for respondent.

Lawrence S. Ebner, Washington, D. C., with whom Charles A. O'Connor, III and Robert A. Anthony, Washington, D. C., were on the brief for intervenor Ciba-Geigy Corp. in No. 79-1971 and amicus curiae National Agri Chemicals Ass'n urging reversal in Nos. 79-1971 and 79–2133.

Thomas O. McGarity, Washington, D. C., was on the brief for amicus curiae, American Public Health Ass'n, et al. urging reversal and remand in Nos. 19–1971 and 79–2133.

Before McGOWAN and WILKEY, Circuit Judges and RONALD N. DAVIES,*

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Senior United States District Judge for the District of North Dakota.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioners Environmental Defense Fund, Inc. (EDF) and Florida Citrus Mutual (Florida Citrus) challenge the Environmental Protection Agency's (EPA) refusal to hold an administrative hearing regarding an order restricting the use of chlorobenzilate in four citrus growing states and banning its use elsewhere. The EPA concluded that EDF was not a party "adversely affected" by the order, and that Florida Citrus's request for a hearing was untimely. While we do not adopt entirely the reasoning of the EPA, we affirm its decision denying the requests for an administrative hearing.

OUTLINE OF OPINION

I. BACKGROUND

II. JURISDICTION

   A. Order
   B. Public Hearing
      1. Statutory Language
      2. Case Law
      3. Other Statutes
      4. Legislative History
      5. Judicial Policy

III. EDF'S RIGHT TO ADMINISTRATIVE HEARING

   A. Cancellation
   B. Noncancellation
      1. Agency Rationales and Appellate Arguments
      2. Discussion
         (a) Structure and Language of Section 6(b)
         (b) Legislative Intent
         (c) Relationship with Other Parts of FIFRA
         (d) Other Considerations
      3. Conclusion as to EDF's Hearing Right

IV. TIMELINESS OF FLORIDA CITRUS'S HEARING REQUEST

V. CONCLUSION

## I. BACKGROUND

On 26 May 1976 the Administrator of the EPA initiated a Rebuttable Presumption Against Registration (RPAR) proceeding to determine whether unrestricted use of chlorobenzilate, a carcinogenic miticide, should continue.[1] The RPAR process is an administrative proceeding designed by the EPA to gather and evaluate information about the risks and benefits of certain pesticides. Written public participation in the preliminary notice and comment stage of RPAR process was invited.[2] The Administrator published his preliminary determinations respecting the risks and benefits of chlorobenzilate uses on 11 July 1978.[3] Pursuant to statute the Administrator referred his preliminary determination to the Secretary of Agriculture[4] and a scientific advisory panel[5] before initiating final action. An opportunity to the interested public was extended for comment on the Administrator's preliminary determinations. Both EDF and Florida Citrus, among others, submitted written comments and attended a public meeting[6] held by the scientific advisory panel.

On 13 February 1979 pursuant to section 6(b) of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)[7] the EPA published a Notice of Intent to Cancel Registrations and Deny Applications for Registration of Pesticide Products Containing Chlorobenzilate.[8] The notice communicated the EPA's intention to restrict the use of chlorobenzilate in four citrus-growing states and to ban its use elsewhere. Both EDF and Florida Citrus requested section 6(d) administrative hearings and filed ob-

---

1. 41 Fed.Reg. 21,517 (1976).

2. *See* 40 C.F.R. § 162.11 (1978).

3. 43 Fed.Reg. 29,824 (1978).

4. 7 U.S.C. § 136(b) (1976).

5. 7 U.S.C. § 136d(d) (1976).

6. *See* 43 Fed.Reg. 32,185 (1978).

7. 7 U.S.C. § 136d(b) (1976).

8. 44 Fed.Reg. 9548 (1979).

jections to the intended cancellation, the former because its provisions were too lenient, the latter because its provisions were too stringent. Florida Citrus's request, however, was not received by the EPA until 20 March 1979, more than 30 days after publication of the notice in the *Federal Register.*

On 11 April 1979 the ALJ assigned to the case issued a show cause order why an accelerated decision should not be issued against EDF and Florida Citrus.[9] On 22 May 1979 the ALJ issued an accelerated decision, in which he dismissed Florida Citrus's objections as not timely.[10] He also ruled against EDF, based on the recent administrative decision, *In re Shell Oil,* which held that no party has a right to seek more stringent relief than that proposed in a section 6(b)(1) notice. The parties appealed administratively; the Administrator issued a Final Decision on 20 August 1979, affirming the ALJ's decision on all grounds. The Administrator agreed that Florida Citrus had not filed within the time limits set out by FIFRA. He also concluded that EDF was not a party "adversely affected" by the cancellation notice, and therefore was not entitled to request an administrative hearing.[11]

On 18 December 1979 intervenor Ciba-Geigy Corp. filed a motion to dismiss on the basis that jurisdiction to review the challenged order lay in the district court and not in the court of appeals.[12] This court denied the motion on 19 February 1980.[13]

## II. JURISDICTION

Intervenor Ciba-Geigy argues that the petitions for review should be dismissed on the ground that this court lacks jurisdiction to review the action of the Administrator under the judicial review provisions of section 16 of FIFRA. That section provides:

(a) *District court review*—Except as is otherwise provided in this subchapter, Agency refusals to cancel or suspend registrations or change classifications not following a hearing and other final Agency actions not committed to Agency discretion by law are judicially reviewable in the district courts.

(b) *Review by court of appeals*—In the case of *actual controversy* as to the validity of any *order* issued by the Administrator following a *public hearing,* any person who will be *adversely affected* by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part.[14]

Because an "actual controversy" surrounds the Administrator's action and both petitioners claim to be "adversely affected" by the action, this court has jurisdiction if the EPA action is an "order issued by the Administrator following a public hearing."

In asserting that this court lacks jurisdiction, Ciba-Geigy argues that the proceedings before the Chief Administrative Law Judge and before the Administrator did not constitute a "public hearing" within the meaning of section 16(b) of FIFRA. Instead, those proceedings *denied* the parties the right to a formal section 6(d) hearing later. In other words, it is asserted that what we have had is not a "hearing" or "public hearing," but a "proceeding" to de-

9. *In re Environmental Defense Fund,* FIFRA Docket No. 411 *et al.* (11 Apr. 1979), *reprinted in* Joint Appendix (J.A.) at 113–15.

10. *In re Environmental Defense Fund,* FIFRA Docket No. 411 *et al.,* slip op. at 7–11 (22 May 1979), *reprinted in* J.A. at 72, 78–82.

11. *Id.* at 1–7, *reprinted in* J.A. at 72–78.

12. Motions to Dismiss and for Separate Argument.

13. *Environmental Defense Fund, Inc. v. Costle,* Nos. 79–1971, 79–2133 (19 Feb. 1980). The panel consisted of Chief Judge Wright, Senior Judge Bazelon, and Judge Wilkey. Judge Wilkey did not participate in the order.

14. 7 U.S.C. § 136n(a)–(b) (1976) (emphasis added).

termine if there will be a "public hearing." In addition, Ciba-Geigy asserts that the Administrator's action was not an "order" within the meaning of section 16(b). Because EDF and Florida Citrus are not challenging an "order . . . following a public hearing," Ciba-Geigy argues, the court of appeals lacks jurisdiction. The final decision should therefore be reviewed in the district court under the section 16(a) prescription for district court review of "other final Agency actions not committed to Agency discretion by law . . . ."

In response, EDF, Florida Citrus, and the EPA argue that review in this Court is proper. They assert that the final decision is an "order," and that the record compiled through the proceedings before both the ALJ and the Administrator is sufficient to fit within the requirements of a "public hearing." In sum, while Ciba-Geigy argues that the only agency action was summary *denial* of the public hearing prescribed by section 6(d) of FIFRA, the other parties insist that the decision to deny the 6(d) hearing *was itself* based on a "public hearing" before the agency.

Thus, the jurisdiction of this Court to review the agency action at issue here turns both on whether the final decision was an "order" and on whether that action followed a "public hearing" within the meaning of section 16 of FIFRA. The meaning of those terms within the context of the judicial review provisions of FIFRA is a question of first impression for this Court.

### A. *Order*

■ Ciba-Geigy asserts that EPA's decision is not an "order" within the meaning of section 16(b). While it concedes the decision is an order within the meaning of the Administrative Procedure Act,[15] it argues that FIFRA contemplates "that a reviewable order is to be matured, fully deliberated agency action, taken after ample opportunity for development of the factual record

upon which it must be supported." Here, Ciba-Geigy maintains that no such mature, deliberated action took place; rather, the EPA's decision was "very much by way of preliminary and summary action."[16]

No authority other than the structure of section 16(b) is cited by Ciba-Geigy to show that "order" in FIFRA means anything more than an order within the meaning of the APA. Ciba-Geigy's argument seems to boil down to this: The EPA decision is not an "order" within the meaning of section 16(b) because it is not the kind of order *Congress wanted appellate courts to review.*

We think that, if the order followed a "public hearing," it is the type of order Congress intended appellate courts to review. We find no authority that Congress intended further to refine the meaning of "order" in section 16(b). Therefore, we turn now to the question whether the order followed a "public hearing."

### B. *Public Hearing*

■ In considering whether the challenged order issued after a "public hearing," it is helpful to review the nature of the proceedings and submissions before the EPA. In the proceedings before the ALJ, legal memoranda were submitted by EDF, the EPA, Ciba-Geigy, and the Department of Agriculture. Although a pre-hearing conference was scheduled, none was held. Oral argument on the issues before the ALJ was requested and denied. At the conclusion of the proceedings, the ALJ issued his Accelerated Decision, and the parties filed exceptions. On appeal to the Administrator, the same parties again submitted briefs, and EDF filed a reply brief to the EPA's memorandum. The Administrator's Final Decision followed. In all, the EPA took 186 pages of argument and supporting exhibits.[17] The certified index of the record lists 68 items.

---

**15.** 5 U.S.C. § 551(6) (1976).

**16.** Motions to Dismiss and for Separate Argument 35.

**17.** *See* Response of Petitioner Environmental Defense Fund to Intervenor's Motion to Dismiss 10.

In arguing that the Administrator did not make his decision to deny the section 6(d) hearing on chlorobenzilate after a "public hearing," Ciba-Geigy points to the lack of public notice, the absence of public participation, and the lack of any type of oral presentation by the parties. Rather, Ciba-Geigy characterizes the EPA's action as a "short-lived summary proceeding to determine whether the petitioners' requests for hearing should be dismissed."[18] The other parties, who oppose Ciba-Geigy's motion, insist that a "public hearing" within the context of the FIFRA judicial review provision can be far less than a formal, evidentiary proceeding. Relying on decisions that require no such proceedings to satisfy a "hearing" requirement and on legislative history that points to the importance of a record for appellate court review, these parties emphasize that appellate review of the Administrator's order requires a decision only as to a matter of law and can be made on the basis of the record already compiled before the agency.

Neither FIFRA nor federal law articulates a definition of the term "public hearing."[19] In resolving the jurisdictional question, we must turn to other sources. Examination of references to public hearings in FIFRA, interpretive case law, and the meaning of analogous language in other statutes is helpful, but does not unambiguously resolve the question. However, FIFRA's legislative history and judicial policy strongly indicate that the proceedings constituted a public hearing within the meaning of section 16(b).

### 1. *Statutory Language*

Although FIFRA does not define "public hearing," it does use that term in several of its sections. Section 16(b) invokes appellate court review only of an "order issued . . following a public hearing." Review is to be based on all evidence of record, and the decision of the Administrator is to be sustained if supported by substantial evidence, considered on the record as a whole.[20] Section 6(d) describes the procedures to be followed in a public hearing held pursuant to a section 6(b) request. Section 6(d) refers to the necessity of due notice, and the production of evidence, documents, and testimony.[21] Section 14(a) requires notice and opportunity for "a hearing" before civil penalties can be assessed under the Act, but does not describe the nature of the hearing.[22] Section 21(b) allows the Administrator to solicit the views of all interested persons in connection with his other authority relating to public hearings.[23] In addition, section 21(c) provides that "[i]n connection with all public hearings under this subchapter the Administrator shall publish timely notice of such hearings in the Federal Register."[24]

Ciba-Geigy urges that the combination of these provisions, especially the description of the procedures required in a section 6(d) hearing, shows that the "public hearing" needed prior to appellate review under section 16(b) of FIFRA is a formal affair with at least some opportunity for oral presentation.

■ While this argument has some appeal, we are not persuaded. That FIFRA establishes certain types of hearing proceedings and procedures does not definitively prove that these are the only "public hearings" able to serve as predicates of appellate court review. Furthermore, it is possible for a term to have different meanings, even in the same statute.[25] As we

---

**18.** Motion to Dismiss and for Separate Argument 18.

**19.** *Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872, 879 n.14 (1st Cir. 1978).

**20.** 7 U.S.C. § 136n(b) (1976).

**21.** *Id.* § 136d(d).

**22.** *Id.* § 136*l*(a).

**23.** *Id.* § 136s(b).

**24.** *Id.* § 136s(c).

**25.** Thus the implicit partial definition of public hearing in § 21(c) does not necessarily govern its meaning in § 16(b). Section 21(c) provides: "In connection with all public hearings under this subchapter the Administrator shall publish timely notice of such hearings in the Federal Register." This implies that any proceeding in

observed in another case construing the meaning of "order" for judicial purposes: "[T]he word 'order' has several frequently utilized meanings which vary in scope, and it is therefore not surprising that different sections of the same statute might use the word in different ways." [26]

In the absence of an explicit or conclusive contextual definition of "public hearing" in FIFRA itself, in resolving the jurisdictional question we think it wise to consult sources that might shed light on its meaning.

### 2. Case Law

Section 16(b) has been litigated rarely, and no decision has defined precisely the term "public hearing" as it is used in that section. In Louisiana v. Train,[27] a district court in the Western District of Louisiana addressed the question of appellate court jurisdiction under section 16(b). The EPA hearing that was the focus of the case had consisted of the presentation of 93 witnesses, 1180 pages of transcript, and 1080 pages of exhibits over a period of five days. The proceeding was an informal public hearing, rather than a formal adjudicatory hearing within the meaning of section 554 of the APA. The district court recognized that section 6(d) of FIFRA contemplated formal public hearings for cases of cancellation, suspension, or refusal to register a pesticide. In addition, however, the court noted that section 21(b) allows the Administrator to solicit the views of interested persons concerning actions taken under the Act. This solicitation, the court concluded, would involve informal, rather than formal, public hearings. Because these FIFRA provisions indicated that Congress had contemplated that both formal and informal proceedings were "public hearings," and because legislative history did not suggest that Congress intended "public hearing" to mean only a formal public hearing, the district court concluded that an EPA order following an informal public hearing was sufficient to trigger appellate court review under FIFRA. The Fifth Circuit affirmed without opinion.

While helping illuminate the meaning of "public hearings," Louisiana v. Train is distinguishable from the present case. The informal hearings in Train occurred after notice of proposed public hearings appeared in the Federal Register, presumably as required by section 21(c) of FIFRA.[28] Moreover, the Train hearings included oral presentations, examinations of witnesses, and extensive evidence.

Although Train does not resolve the question confronting the court, it does indicate that the term "public hearing" encompasses more than just section 6(b) hearings.

### 3. Other Statutes

Absent a definition or conclusive indications of the meaning of "public hearing" in FIFRA and interpretive case law, it is instructive to examine the meaning of similar terms in other statutes. It appears that the term "hearing" does not always require formal proceedings, or even oral presentations.

In Florida East Coast Railway [29] the Supreme Court held that, at least in some contexts, the term "hearing" should be

---

which notice is not so published is not a public hearing, and since no such notice was published in this case, arguably no public hearings preceded the order. But §§ 21(c) and 16(b) are concerned with different matters, and "public hearing" in each must be interpreted in light of those differing concerns. Section 21(c) is procedural, governing the input of agency decisions; § 16(b) is jurisdictional, focusing on the kind of decision courts of appeals should review. In interpreting § 21(c), one must inquire what kind of proceedings Congress thought needed to be announced via the Federal Register. In interpreting § 16(b), one must ask what type of proceeding Congress wanted courts of appeals to review. As will be discussed, we think the agency proceedings and decision here meet the concerns motivating Congress's restriction of appellate court review to "orders . . . following a public hearing."

**26.** Investment Co. Inst. v. Board of Governors, 551 F.2d 1270, 1278 (D.C.Cir.1977).

**27.** 392 F.Supp. 564 (W.D.La.) aff'd mem., 514 F.2d 1070 (5th Cir. 1975).

**28.** But see note 25 supra.

**29.** 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

defined by reference to the use of that term in the Administrative Procedure Act.

> [C]onfronted with a grant of substantive authority made after the Administrative Procedure Act was enacted, we think that reference to that Act, in which Congress devoted itself exclusively to questions such as the nature and scope of hearings, is a satisfactory basis for determining what is meant by the term "hearing" used in another statute. Turning to that Act, we are convinced that the term "hearing" as used therein does not necessarily embrace either the right to present evidence orally and to cross-examine opposing witnesses, or the right to present oral argument to the agency's decisionmaker.[30]

Applying this reasoning to section 1(14)(a) of the Interstate Commerce Act,[31] the Court held that the hearing requirement was satisfied by the "opportunity to comment, to object, or to make some other form of written submission."[32] Other authority supports the conclusion that a "hearing" need not require formal proceedings or oral presentations.[33]

The absence of oral presentations in the challenged proceedings would not disqualify them from being labeled "hearings." But here we consider the meaning not just of "hearing," but of "public hearing." Ciba-Geigy asserts that "public hearing" means something more. It cites circuit court decisions that construe "public hearing" in other statutes to require oral presentation or public participation.

For example *Seacoast Anti-Pollution League v. Costle*[34] construed the Federal Water Pollution Control Act (FWPCA) Amendments of 1972 and the requirement of the "opportunity for a public hearing" for operators of effluent sources prior to an effluent limitation. The First Circuit stated that

> the FWPCA requires the EPA to afford an opportunity for a *public hearing*. We do not believe that an opportunity to submit documents constitutes a public hearing. Nor do we believe that the Administrator can comply with the statute merely by taking some evidence at a public hearing and then taking the rest in written form.[35]

Despite the provision of section 556(d) of the Administrative Procedure Act that allowed agency "procedures for the submission of all or part of the evidence in written form," the court found that the requirement of a public hearing meant something more than only written submissions. Other decisions have also stressed the importance of oral as well as written participation, when a public hearing is required by statute.[36]

While these opinions do indicate that "public hearing" in some statutes requires oral public participation, they do not control the interpretation of section 16(b). These decisions construe the meaning of the term "public hearing" in a context entirely different from that of section 16(b) of FIFRA; they consider what procedures should be followed in the process of agency decisionmaking,[37] *rather than what "public hearings" trigger appellate review.*

---

30. *Id.* at 240, 93 S.Ct. at 818 (footnote omitted).

31. 24 Stat. 379 (1887) (current version at 49 U.S.C. § 11122 (Supp. II. 1978)).

32. 410 U.S. at 241, 93 S.Ct. at 819.

33. *E. g., United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *Morgan v. United States,* 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936).

34. 572 F.2d 872 (1st Cir. 1978).

35. *Id.* at 879 (emphasis in original) (footnote omitted).

36. *E. g., South Terminal Corp. v. EPA,* 504 F.2d 646 (1st Cir. 1974); *Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973); *Virgin Islands Hotel Ass'n v. Virgin Islands Water & Power Auth.,* 465 F.2d 1272 (3d Cir. 1972).

37. *Compare Mobil Oil Corp. v. Federal Power Commission,* 483 F.2d 1238 (D.C.Cir.1973), *with Independent Cosmetic Mfrs. v. HEW,* 574 F.2d 553, 560 (D.C.Cir.1978) (Wilkey, J., dissenting). *See also* Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267 (1975).

To determine whether a broader or narrower construction of "public hearing" should be a prerequisite to appellate review, we turn to the legislative history to examine the purpose of the requirement.

### 4. Legislative History

The present judicial review system in FIFRA dates from 1972. Prior to 1972, FIFRA had provided for appellate review in a case of actual controversy as to the validity of an EPA order.[38] No express provision prescribed district court review. In a pre-1972 decision which considered judicial review under FIFRA, this court noted that the review provisions "contemplated that judicial review would ordinarily occur . . . after advisory committee proceedings and a public hearing. But they do not make advisory committee proceedings or a public hearing a jurisdictional prerequisite to review."[39] Even the lack of a hearing record, the court thought, would not preclude review entirely.

The 1972 amendments to FIFRA established judicial review for different types of agency action in both the district and the appellate courts. In its report the Senate Committee on Agriculture and Forestry indicated that the question of judicial review was one of major concern and study. The Committee believed that it had simplified the procedures for review by providing that Agency actions taken after a hearing were to be reviewed by courts of appeals and those taken without a hearing in the district courts.[40]

The Senate report explained the appropriate division of judicial review as follows:

After a hearing judicial review on petition by any person adversely affected is properly lodged in the *courts of appeals, since an adequate record exists for such review.* Where, however, the Administrator has determined no substantial question of safety exists which warrants formal review, and thus has refused to hold a hearing, review should be by a *district court since there is no record for the court of appeals.*[41]

In Part II of the same Senate report, the Committee quoted this language and added:

In short, the Committee on Agriculture and Forestry believes that matters which have not been heard before should go to courts of original jurisdiction and appeals from cases which have already been administratively heard and decided should go to appellate courts. The question is really that simple.[42]

Ciba-Geigy argues that because the Administrator "has refused to hold a hearing," no "public hearing" has occurred to give this court jurisdiction. It is true that no hearing concerning cancellation *per se* has taken place, and we are presently without jurisdiction to review the merits of EPA's decision conditionally to cancel registration of chlorobenzilate. *But that is not the issue presented us. The question raised in this case is the legality of denying a section 6(d) hearing, and that issue has "already been administratively heard and decided."*[43]

Furthermore, the Committee's considerable emphasis on the existence of a reviewable record must be considered in reaching a conclusion as to our jurisdiction. The Committee reasoned that appellate review was appropriate after a hearing because *"an adequate record exists for such review."*[44] Legislative developments subsequent to the

---

**38.** *See Nor-Am Agricultural Prods., Inc. v. Hardin*, 435 F.2d 1151, 1156 (7th Cir. 1970).

**39.** *EDF v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971) (footnote omitted).

**40.** S.Rep.No. 92–838, 92d Cong., 2d Sess. 28, *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 3993, 4019.

**41.** *Id.* at 13, *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 4004 (emphasis added).

**42.** *Id.*, pt. II, at 50–51, *reprinted in* [1972] U.S. Code Cong. & Admin.News, p. 4070 (emphasis added).

**43.** *Id.*

**44.** *Id.*, pt. I, at 13, *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 4004.

1972 amendments [45] are also consistent with the proposition that the availability of a record is especially significant in appellate review. During consideration of the 1975 FIFRA amendments, the National Agricultural Chemicals Association attempted to restrict the judicial review provisions to orders following a public hearing "pursuant to Section 6 of this Act." That change was deleted in Senate floor debate.[46] The Senate's substitution, "for which there is a reviewable record," was also deleted during conference. Section 16(b) remained unchanged. The conference report, however, made it clear that the availability of a reviewable record was the basis for appellate review:

> It is the intent of the Conferees, however, that an adequate reviewable record be developed by the Environmental Protection Agency in each of its public hearings although such hearings need not necessarily be adjudicatory in nature.[47]

In 1977 the National Agricultural Chemicals Association proposed that any order to be given appellate review be based on the record of a formal or due process hearing. The Association was responding to the Administrator's position that an order following any type of public hearing was to receive appellate review. The Senate rejected the proposal, and the report notes:

> The Subcommittee then took up the proposal of the National Agricultural Chemicals Association that would require that all Environmental Protection Agency public hearings directly reviewable in the courts of appeal be adjudicatory in nature. It was decided that there was no compelling reason for changing existing law and the proposal was not adopted.[48]

The legislative history of the 1972 amendment, then, demonstrates that *underlying the restriction of appellate review to orders following public hearings was congressional concern that review be based on an administrative decision with an adequate record.* The history of subsequent attempts to amend FIFRA shows no lessening of these concerns.

Here, no facts are at issue. The petition presents a pure question of law. The submissions before the Agency and its decisions constitute a completely adequate record for us to review. This being the case, we conclude that the proceedings before the agency sufficiently meet the concerns of Congress animating section 16(b) to qualify as a public hearing.

5. *Judicial Policy*

It should be noted that our conclusion that these proceedings constituted the kind of public hearing Congress intended to trigger appellate review is in accord with sound judicial policy. In determining when agency regulations are a "final order" allowing appellate court jurisdiction, this court has stated, "[i]t is the availability of a record for review and not the holding of a quasi judicial hearing which is now the jurisdictional touchstone." [49] Also, where "the administrative record forms the basis for review, requiring petitioners challenging regulations to go first to the district court results in unnecessary delay and expense . . . and undesirable bifurcation of the reviewing function between the district courts and the courts of appeals." [50] Where

---

**45.** Although the subsequent history is not as persuasive as statements contemporaneous with the statute's enactment, it is entitled to "some weight 'as a secondarily authoritative express of expert opinion.'" *Copeland v. Martinez,* 603 F.2d 981, 988 (D.C.Cir.1979), *cert. den.,* 444 U.S. 1044, 100 S.Ct. 730, 62 L.Ed.2d 729 (1980) (quoting *Parker v. Califano,* 561 F.2d 320, 339 (D.C.Cir.1977) (quoting *Bobsee Corp. v. United States,* 411 F.2d 231, 237 n.18 (5th Cir. 1969)).

**46.** 121 Cong.Rec. 36,116 (1975).

**47.** H.R.Rep.No. 94–668, 94th Cong., 1st Sess. 6 (1975), [1975], U.S.Code Cong. & Admin.News pp. 1359, 1381.

**48.** S.Rep.No. 95–334, 95th Cong., 1st Sess. 12 (1977).

**49.** *Deutsche Lufthansa Aktiengesellschaft v. CAB,* 479 F.2d 912, 916 (D.C.Cir.1973).

**50.** *Investment Co. Inst. v. Board of Governors,* 551 F.2d 1270, 1276 (D.C.Cir.1977) (citations omitted).

administrative proceedings have developed an adequate record, judicial policy favors appellate review; where no record or an insufficient record is developed, district court review is generally appropriate.

In this case, not only does a record exist, but it is "an adequate record . . . for such review."[51] The agency action in refusing to hold section 6(d) hearings at the request of both EDF and Florida Citrus raised issues of law; those issues were briefed by the parties, and considered by the Agency. An order expressing Agency rationale resulted. It would seem that few, if any, further insights could have been gained through further proceedings. Moreover, no fact finding will be necessary in the process of judicial review. Appellate court review on the basis of this sufficient record is consistent with judicial policy. Involving a district court first not only would not necessarily benefit the parties, but in view of the likelihood of appeal might well be a waste of time and effort by the court and parties.

We recognize that Congress may allocate judicial review responsibilities as it pleases, with or without regard to consideration of judicial economy or policy.[52] Here, fortunately, Congress designed review provisions with the jurisdictional touchstone of the reviewable record in mind. Referring to the existence of an adequate record in deciding if an order followed a public hearing within the meaning of section 16(b) is consistent with the legislative history and judicial policy.

Because the record before us is wholly adequate for judicial review, we conclude the proceedings antecedent to the Adminis-

trator's order were a "public hearing" granting this court jurisdiction to review the challenged order.

## III. EDF'S RIGHT TO ADMINISTRATIVE HEARING

EDF maintains that it was entitled to an administrative hearing pursuant to section 6(b) because it was a person adversely affected by the notice. Section 6(b) provides in pertinent part:

> The proposed action shall become final and effective at the end of 30 days from receipt by the registrant, or publication, of a notice issued under paragraph (1) whichever occurs later, unless within the time . . . (ii) a request for a hearing is made by a person adversely affected by the notice.[53]

The EPA contends that EDF is not adversely affected within the meaning of section 6(b), and that its remedy is district court review of the decision to retain pursuant to section 16(a). In relevant part that section states: "Agency refusals to cancel . . registrations . . . not following a hearing . . . are judicially reviewable in the district courts."[54]

We hold that to the extent the notice *cancels* uses of chlorobenzilate, EDF is not adversely affected. To the extent EDF challenges the *retention* of registration as restricted, it is not entitled to an administrative hearing.

### A. Cancellation

■ EDF filed objections to the Administrator's notice in order to challenge "continued use of chlorobenzilate in citrus groves."[55] It is thus the retention, *not the*

---

**51.** S.Rep.No. 92–838, 92d Cong., 2d Sess. 13, *reprinted in* [1972] U.S.Code Cong. & Admin. News, p. 4004; *see Independent Cosmetic Mfrs. v. HEW*, 574 F.2d 553, 576 (D.C.Cir.1978) (Wilkey, J., dissenting).

**52.** *Harrison v. PPG Indus., Inc.*, ___ U.S. ___, ___, 100 S.Ct. 1889, 1898, 64 L.Ed.2d 525 (1980); *see Independent Cosmetic Mfrs. v. HEW*, 574 F.2d 553, 568 (D.C.Cir.1978) (Wilkey, J., dissenting).

**53.** 7 U.S.C. § 136d(b) (1976).

**54.** *Id.* § 136n(a).

**55.** Brief for Petitioner EDF at 6. Specifically EDF objected to:
a) the Agency's assessment of both the risks and benefits of the use of chlorobenzilate on citrus;
b) the Agency's determination that modifications in the terms or conditions of registration of products containing chlorobenzilate for use on citrus will reduce risks sufficiently to eliminate any unreasonable adverse effects on man or the environment;

cancellation aspect of the notice, that EDF maintains adversely affected it. As a matter of fact, because no objections were filed in a timely manner to the cancellation aspects of the notice, EDF maintains that that aspect of the notice should go into effect immediately. Because EDF was not adversely affected by cancellation and restrictions of chlorobenzilate uses, as to that portion of the notice EDF clearly neither has nor claims a right to a hearing.

## B. *Noncancellation*

### 1. *Agency Rationales and Appellate Arguments*

The rationales used by the EPA throughout these proceedings to deny EDF an administrative hearing have not been entirely consistent.[56] First, the ALJ ruled that to consider in the cancellation proceedings restrictions on the use of chlorobenzilate greater than those proposed in the cancellation notice would be improper. He relied on *In re Shell Oil Co.*,[57] a decision by the Judicial Officer of the EPA issued 9 April 1979 which prohibited consideration in a section 6(b)(1) proceeding of contentions that a conditional cancellation is insuffi-

ciently restrictive. EDF did not challenge the applicability of *Shell,* but argued that it had been wrongly decided. The ALJ considered himself bound by *stare decisis.* Although he *assumed* that EDF *was* adversely affected by the notice,[58] he held that its objections were outside the scope of the cancellation proceeding, and he denied the hearing request.[59]

Then, while *affirming* the decision of the ALJ "in its entirety," [60] the Administrator's opinion focused on the proposition that EDF was *not* a party "adversely affected" by the notice of cancellation. The Administrator maintained that EDF was an "adversely affected" party under section 16(a) of FIFRA, but not under section 6(b). In his view, "adversely affected" persons within the meaning of section 6(b) principally meant registrants and users.[61] Finding no indications that Congress meant to include within the category of those who could request section 6(b)(1) hearings anyone besides parties adversely affected by *cancellation* of registration, the Administrator concluded that parties affected only by the failure to restrict pesticides more stringently were not entitled to request a hearing. Having thus determined that EDF was *not*

---

c) the Agency's failure to cancel citrus uses of chlorobenzilate products after a limited phase-out period during which alternatives can be registered; and
d) the Agency's failure to require the examination of sperm counts in a selected population of chlorobenzilate applicators and citrus pickers exposed to chlorobenzilate to gather data on the potential adverse effects of chlorobenzilate on human reproduction. Request for Hearing and Objections of the Environmental Defense Fund to the Notice of Intent to Cancel Registrations of Chlorobenzilate at 2–3, *reprinted in* J.A. at 147–48.

56. Interestingly EPA counsel originally argued rather strenuously to the ALJ that EDF could be adversely affected by a retention decision within the meaning of § 6(b). Respondent's Reply to Memorandum of Petitioner Environmental Defense Fund in Response to Notice to Show Cause of 11 April 1979, at 6–10, *reprinted in* J.A. at 88–92. Agency counsel changed its position in argument before the Administrator, contending that only those desiring to stop cancellation can be "adversely affected" within the meaning of § 6(b). Respondent's Reply to Exceptions and Appeal by Environmental De-

fense Fund from Accelerated Decision at 4, *reprinted in* J.A. at 45.

57. FIFRA Docket No. 401 *et al.* (9 Apr. 1979), *reprinted in* J.A. at 116–35.

58. *In re Environmental Defense Fund*, FIFRA Docket No. 411 *et al.*, slip op. at 4 n.4 (22 May 1979), *reprinted in* J.A. at 75 n.4.

59. *Id.* at 4–5, *reprinted in* J.A. at 75–76.

60. *In re Environmental Defense Fund*, FIFRA Docket No. 411 *et al.*, slip op. at 39 (23 Aug. 1979), *reprinted in* J.A. at 39.

61. He cited legislative history indicating that users of pesticides were the prime movers behind 1972 amendments allowing "persons adversely affected by the notice" to request an administrative hearing instead of just "registrants" of the pesticide. The Administrator cited language in the legislative history and a Fifth Circuit opinion demonstrating that the amendment was to allow users to request hearings.

an adversely affected party,[62] the Administrator largely ignored [63] the *Shell* Oil arguments.[64]

In its appellate brief the EPA has further refined its argument. Although not eschewing the Administrator's rationale, the EPA now suggests that under the 1972 Amendments no person could ever be adversely affected by an insufficient notice of cancellation.[65] The 1972 amendments extended the right to initiate hearings to those adversely affected by cancellation, but not to those who claim injury because a notice failed to announce *unconditional* restrictions (*i. e.*, sufficient restrictions) upon the use of the pesticide. The EPA contends, however, that the 1972 amendments granted it no authority to issue contingent notices at all; therefore, the amendments may not be construed to extend hearing rights as suggested by EDF. According to the EPA, it was not until 1975 that Congress tacitly allowed it to issue *conditional*

cancellation notices by changing the standard from a "substantial question of safety" determination to a *balancing* of economic, social, and environmental factors. EPA would ascribe no intent to Congress to change at that time the category of persons permitted to request hearings.

*Thus, only those injured by the PROHIBITORY aspect of a notice's cancellation or restriction provisions may request a hearing. EDF, on the other hand, claims injury only from the PERMISSIVE aspect of the notice.* The permissive aspect is really only a preservation of the status quo, or a part of the status quo. The Agency maintains that a failure to take more restrictive action in a notice (*i. e.*, retaining the status quo in part by permitting certain qualified uses) does not injure a party in the way Congress intended when it granted "adversely affected" parties the right to request administrative hearings.[66]

**62.** *In re Environmental Defense Fund*, FIFRA Docket No. 411 *et al.*, slip op. at 10 (23 Aug. 1979), *reprinted in* J.A. at 17.

**63.** The Administrator did deal briefly with EDF's argument that any EPA authority to enlarge the scope of relief in a section 6(b)(1) hearing beyond that proposed in the notice would not pose due process problems. *Id.* at 27, *reprinted in* J.A. at 33.

**64.** On appeal EPA maintains that we need not reach the *Shell* issue respecting the proper scope of § 6(b)(1) proceedings. Brief for Respondent at 45–48. Because we conclude the request for a hearing was properly denied, we do not decide what issues are appropriate at a properly initiated hearing.

**65.** It notes that prior to 1972 the Administrator had virtually no option *conditionally to cancel* registrations; if he found that there was a substantial question as to the safety of the pesticide, he was obligated to issue a notice of *unconditional* cancellation. No person could be adversely affected by the retention part of a notice because all cancellation notices were unconditional. *After* a section 6(b) hearing, the Administrator could issue an order that partially or conditionally cancelled pesticide registrations, but not before. The EPA argues that in enacting the 1972 amendments Congress intended that the "substantial question" standard for issuing cancellation notices continue, and therefore all cancellation notices were to be unconditional. Brief for Respondent at 29–30 note * (quoting S.Rep.No. 92–838, 92d Cong.,

2d Sess. 12–13 (1972) and 40 Fed.Reg. 28255 (1975). *See also* H.Rep.No. 92–1540, 92d Cong., 2d Sess. 32 (1972) ("[the amended FIFRA] preserves cancellation criteria in existing law"). Its still being the case that no person could be adversely affected by the failure of a notice to go far enough, Congress could not have intended that such entities be among those adversely affected parties that may request administrative hearings.

**66.** EDF on the other hand argues that "adversely affected" means the same thing in section 6(b) as it does in section 16(a). It maintains that in the absence of contrary evidence the words should be interpreted the same way. It notes that the 1972 amendments instructed the Administrator to issue cancellation notices whenever it found that continued use of pesticide would result in "*unreasonable* adverse effects on the environment," Federal Environmental Pesticide Control Act of 1972, § 6(b), Pub.L.No. 92–516, 86 Stat. 973 (codified at 7 U.S.C. § 136d(b) (1976)), that phrase defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 2(bb) (current version at 7 U.S.C. § 136(bb)).

EDF argues that whatever the standard for *when* cancellation notices should issue under the 1972 amendments, nothing prevented the EPA from issuing conditional cancellation notices. The Judicial Officer in *Shell Oil* appeared to acknowledge the power of the EPA

Ciba-Geigy notes that EDF is challenging only the decision to retain the pesticide registration subject to certain conditions. It maintains that the structure of FIFRA makes clear that while adversely affected parties have a right to a hearing as to *cancellation* decisions by the EPA, they have no right to challenge in an administrative hearing *retention* decisions by the Agency.

### 2. *Discussion*

■ We have some difficulty with the argument that EDF is not adversely affected by the retention portion of the notice. The EPA's argument is intricate and dependent on congressional knowledge of implied interrelationships of stated and intended notice standards, conditional and unconditional notices, and parties affected thereby. However, we do not reach the issue of whether EDF is adversely affected by the notice, because we conclude that no hearing right is available to challenge only the retention or permissive portion of a cancellation notice.

It is true that in "dealing with a determination or judgment which an administrative agency alone is authorized to make, [the court] must judge the propriety of such action solely by the grounds invoked by the agency." [67] Here, however, we deal solely with a question of statutory construction, an issue within the court's expertise, and we are not bound to follow the route the EPA traveled in interpreting section 6(b).[68]

EDF concedes that, had the Administrator concluded that no cancellation proceedings were warranted, *its only remedy would*

be section 16(a) district court review under the arbitrary and capricious standard.[69] It is clear that were chlorobenzilate already registered under the restrictions of the subject notice of cancellation, and were EPA upon reviewing the situation to conclude that no further restrictions were necessary, EDF's only remedy would be in the district court. The question here is very narrow: whether by being included in the notice of cancellation the decision to continue registration under certain restrictions becomes subject to an administrative hearing and eventual substantial evidence review by the court of appeals. That is, *does section 6(b) compel the EPA to hold an administrative hearing when the only proffered objection concerns the retention portion of a notice of cancellation?* We hold that it does not.

Because we conclude that EDF is not entitled to a hearing as to the retention question only, we do not find it necessary to reach the question whether a party in a validly initiated hearing could expand the scope of the proceedings to consider restrictions more stringent than those proposed by the EPA.

### (a) *Structure and Language of Section 6(b)*

The language of section 6(b) speaks only in terms of cancellation decisions. The Administrator issues a "notice of his intent . . . *to cancel* [the pesticide's] registration." [70] Unless an adversely affected party requests a hearing, the *cancellation* becomes final and effective. At that time any retention portion of the notice becomes no more final than it was prior to the

---

under the 1972 amendments to issue conditional cancellation notices. Slip op. at 12, *reprinted in* J.A. at 127 ("the 1972 amendments provided ample authority for the Agency to consider restrictions on the use of a pesticide as an alternative to cancellation"). EDF also notes that the 1972 amendments to FIFRA were in part motivated by concern that citizens participate in the regulatory process, and therefore "adversely affected" parties under section 6(b) should include those impacted by insufficient restrictions in a notice.

**67.** *SEC v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

**68.** *See* K. Davis, Administrative Law Text § 16.07, at 329 (3d Ed. 1972) (*Chenery* principle "does not apply to functions which courts properly perform, such as . . . interpreting statutes").

**69.** Reply of Environmental Defense Fund to Brief of Intervenor Ciba-Geigy Corp. at 5.

**70.** 7 U.S.C. § 136d(b)(1) (1976) (emphasis added).

cancellation; a party still may petition the EPA to issue an unconditional cancellation notice and obtain district court review of any refusal to do so.[71] Thus, the request for a hearing *stops the cancellation process* and has no effect on the retention portion of the notice.[72] Since the hearing halts the *cancellation* process, logically the purpose of the hearing must be evaluation of the *cancellation* proposal.

Thus, the language and structure of section 6(b) indicate that an adversely affected person may request a hearing to consider reasons why registration should not be cancelled. There is no indication that a party has a right to a hearing to consider solely objections to the retention part of the notice.

### (b) *Legislative Intent*

Prior to 1972 only registrants could request hearings respecting cancellation notices. The 1972 amendments expanded the class which could request hearings, but there is no evidence that Congress intended to change the basic subject matter and purpose of section 6(b) hearings. Legislative history indicates that the class was broadened out of concern that users be allowed to challenge cancellation decisions when registrants declined to do so. As the Fifth Circuit explained in *McGill v. EPA*:

The legislative history suggests that the rights of non-registrants were recognized in the statute because certain Congressmen were concerned that a pesticide producer would choose not to defend a particular registration that was of small importance to the manufacturer, but of great importance to a particular agricultural group. All parties to this litigation agree that the testimony of Dr. Edwin A. Crosby, a representative of the National Canners Association, was instrumental in securing rights for non-registrants in the revised statute. His proposed amendment was designed to protect the rights of users of established pesticides if the producer-registrant decided not to defend against the cancellation or change of a particular registration.[73]

The proposed Crosby amendment would allow any person "adversely affected by cancellation of a registration" to file objections and request an administrative hearing.[74] As adopted by Congress, section 6(b) allows those "adversely affected by the notice" to request a hearing. While this slight change in wording may indicate an intent to broaden the category of hearing requesters, we do not think it evidences a change in the purpose of section 6(b) hearings. The reason Congress adopted the amendment was to allow persons other than

71. *See In re Environmental Defense Fund*, FIFRA Docket No. 411 *et al.*, slip op. at 23 (23 Aug. 1979), *reprinted in* J.A. at 30; 7 U.S.C. § 136n(a) (1976).

72. Furthermore, we believe that interpreting *section 6(b) to allow a hearing request of itself negatively to affect continued registration of a pesticide would contravene section 6(c). Section 6(c) grants the Administrator exclusive authority to suspend registrations when he believes it necessary to "prevent an imminent hazard during the time required for cancellation . . . proceedings." We decline to interpret section 6(b) to permit parties effectively to suspend a registration pending the hearing simply by filing objections and requesting a hearing.*

EDF argues that the EPA could issue regulations allowing the cancellation portion of a notice to go into effect when only the retention portion is challenged. Brief for Petitioner EDF at 18. This may be true. But this does not change the fact that a hearing request is capable only of halting the cancellation process, and of itself not capable of preventing continued registration.

73. 593 F.2d 631, 635–36 (5th Cir. 1979) (citing *Hearings on H.R. 10729, Before the SubComm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture and Forestry*, 92d Cong., 2d Sess. 294 (1972)) (footnote omitted).

74. In full the proposed amendment provided:
Any person who will be adversely affected by cancellation of a registration or change of classification also may file objections and request a public hearing within 30 days of public notice of the Administrator's intention to cancel the registration or to change the classification of a pesticide.
*Hearings on H.R. 10729 Before the SubComm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture and Forestry*, 92d Cong., 2d Sess. 298 (1972).

registrants to compel hearings regarding the *cancellation* decision. While there is evidence that Congress desired participation in administrative proceedings by interested citizens,[75] we find no persuasive indications that Congress intended to alter the function of section 6(b) hearings from the halting of and considering of challenges to cancellation decisions to include consideration of objections that noncancellation decisions are excessively permissive. A party seeking review of the permissive aspect of the Agency decision (*i. e.,* the retention of certain erstwhile qualified uses) may challenge these notice provisions in district court.[76]

### (c) *Relationship with Other Parts of FI-FRA*

We note that our interpretation of section 6(b) is consistent with other aspects of FIFRA. Decisions by the Administrator to deny registration of pesticides may be challenged in an administrative hearing, but not decisions to grant registration.[77] Decisions to suspend registration pending a hearing are subject to an administrative hearing, but not decisions refusing to suspend.[78] As previously noted, decisions to cancel may be challenged in an agency hearing, but not refusals to issue a cancellation notice.

■ The pattern seems to be that decisions regulating more strictly may be challenged in administrative hearings, those regulating less strictly may not.[79] *Thus, persons seeking more stringent regulation may sue in the district court without first enduring an administrative hearing; those complaining of regulation as too strict must first exhaust their administrative remedy of a formal hearing before seeking judicial review.* While all the provisions of FIFRA may not fit precisely into this mold, we think this apparent pattern is useful to

keep in mind. Interpreting section 6(b) to require hearings when an aspect of the cancellation portion of the notice is challenged, but not when the only objection relates to a retention decision, is perfectly consistent with the pattern discerned in FIFRA.

### (d) *Other Considerations*

We also note that this interpretation leaves EDF no worse off than it was before the notice of cancellation. As a matter of fact, EDF is better off. The cancellation of the uses of chlorobenzilate has gone into effect and to that extent EDF is better off than it was before the notice of cancellation issued. Prior to the issuance of the notice any decision not to cancel would have been subject to a district court review under section 16(a), and even now that many of the uses have been cancelled the decision to retain registration for other uses is still subject to district court review. Thus EDF has available to it the same remedies that it did prior to the notice of cancellation, and it is better off for the automatic cancellations of certain uses having gone into effect.

### 3. *Conclusion as to EDF's Hearing Right*

Because EDF was not adversely affected by the portion of the notice cancelling and restricting chlorobenzilate uses, and because it is not entitled to a hearing respecting only the retention portion, we conclude that the Administrator correctly denied EDF's hearing request.

### IV. TIMELINESS OF FLORIDA CITRUS'S HEARING REQUEST

■ With respect to the time period in which a hearing request must be made, section 6(b) states:

---

**75.** For instance Senator Hart maintained that the bill took "important strides in . . . the promotion of citizen participation in the regulatory process through comment before administrative agencies." 118 Cong.Rec. 32,259 (1972).

**76.** *See* notes 77–79 and accompanying text *infra.*

**77.** 7 U.S.C. § 136a(c)(5)–(6) (1976).

**78.** *Id.* § 136d(c) (1976).

**79.** The Food, Drug and Cosmetics Act, 21 U.S.C. § 301 *et seq.* (1976), appears to exhibit a similar pattern. 21 U.S.C. § 355(c)(1)–(2) (1976) (hearing when drug application rejected, no hearing when approved).

The proposed action shall become final and effective at the end of 30 days from receipt by the registrant, or publication, of a notice issued under paragraph (1), whichever occurs later, unless within that time . . . (ii) a request for a hearing is made by a person adversely affected by the notice.[80]

In the notice of cancellation, the EPA outlined the following time limits:

Registrants affected by the actions initiating cancellation of the registered uses of chlorobenzilate may request a hearing on specific registered uses within 30 days of receipt of this notice, or on or before March 15, 1979, whichever occurs later. Any person adversely affected by the cancellation actions initiated by this notice may request a hearing on specific registered uses affected by this notice on or before March 15, 1979.[81]

Florida Citrus filed a request for a hearing on 20 March 1979. It did not respond directly to the ALJ's order to show cause why its request should not be dismissed as untimely; rather, it filed a motion pursuant to 40 C.F.R. § 164.6(b) to enlarge the time within which to file objections. Believing that section 6(b) required the deadline set in the cancellation notice, the ALJ held he was without power to extend the deadline and consequently the objections of Florida Citrus were dismissed.

On appeal to the Administrator, Florida Citrus argued that section 6(b) allows requests to be filed within thirty days from receipt by *any* registrant or publication of the notice, "whichever occurs later." Because Tower Chemical Co., a registrant, did not receive a copy of the cancellation notice until 1 March 1979, Florida Citrus claims the deadline for hearing requests should have been 31 March instead of 15 March.

The Administrator rejected the argument. He reasoned it was unlikely that Congress intended that parties be required to discover the dates that *others* received the notice to find out their own deadline. He ruled instead that the deadline for a registrant was thirty days after *it* received a copy of the notice or thirty days after publication in the *Federal Register*; the relevant time period for a nonregistrant was thirty days after publication.

We agree with the EPA's sensible interpretation of the time limitation. The language of the statute is not without ambiguity, but we do not read it to allow adversely affected parties to request a hearing thirty days after either receipt of the notice by *any* registrant or publication. Indeed, section 6(b) speaks of a time period beginning to run from the date of "receipt by *the* registrant" of the notice. Logically, the relevant time period begin to run for a registrant when notice is published and when *it* receives the notice, not when any other registrant receives notice.

Permitting all adversely affected parties, registrants or nonregistrants, to request a section 6(b)(1) hearing anytime until thirty days after receipt of the notice by the very last registrants would lead to great uncertainty as to time limits. For all we know there may still be a notice in the Postal System that hasn't been delivered to a registrant. Interpreting the statutory time limit to be thirty days after the party receives the type of notice required by statute leads to certainty of rights and deadlines. A registrant knows it has thirty days to request a hearing after receipt of actual or constructive notice, to which it is entitled; the nonregistrant knows it has thirty days from constructive notice, to which it is entitled.[82]

80. 7 U.S.C. § 136d(b) (1976).

81. 44 Fed.Reg. 9548, 9551 (1979).

82. Nonregistrants are not statutorily entitled to actual notice of cancellation, so of the two dates on which the thirty days begin to run, only the date of publication has application. To allow nonregistrants to file requests thirty days after any registrant received notice would give nonregistrants an advantage that registrants do not have. It is true that as we interpret section 6(b), registrants have a slight advantage over nonregistrants because they may request a hearing thirty days after *either* actual notice or constructive notice via publication. But these different time limits flow more than anything else from the different kinds of notice

We hold that the Administrator correctly interpreted the time limitations of section 6(b), and affirm his dismissal of Florida Citrus's objection.

## V. CONCLUSION

We conclude that we have jurisdiction to consider this petition and that the Administrator correctly denied EDF's and Florida Citrus's requests for administrative hearing. The decision of the Administrator is

*Affirmed.*

rights granted by Congress: registrants receive two kinds of notice, nonregistrants one type.

No challenge has been made to the notice provisions legislated by Congress.