659 F.2d 168
 20 ERC 1821, 212 U.S.App.D.C. 122, 11
Envtl. L. Rep. 20,306,
9 Fed. R. Evid. Serv. 608
 DEFENDERS OF WILDLIFE, INC., Appellant,
v.
ENDANGERED SPECIES SCIENTIFIC AUTHORITY, et al.
DEFENDERS OF WILDLIFE, INC.
v.
ENDANGERED SPECIES SCIENTIFIC AUTHORITY, et al.
International Association of Fish and Wildlife Agencies
(Intervenor-Defendant), Appellant.
DEFENDERS OF WILDLIFE, INC.
v.
ENDANGERED SPECIES SCIENTIFIC AUTHORITY, et al.,
Raymond J. Driscoll, et al. (Intervenor-Defendant), Appellant.
DEFENDERS OF WILDLIFE, INC.
v.
ENDANGERED SPECIES SCIENTIFIC AUTHORITY, et al.,
Fur Conservation Institute of America
(Intervenor-Defendant), Appellant.
 Nos. 79-2512, 80-1044, 80-1083 and 80-1084.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 13, 1980.
Decided Feb. 3, 1981.
See 102 S. Ct. 503.
Certiorari Denied Nov.2, 1981.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil Action No. 79-3060).
 Brice M. Clagett, Washington, D. C., with whom Ellen Bass, John B. Douglas III, Oscar M. Garibaldi, and Lawrence N. Minch, Washington, D. C., were on the brief, for Defenders of Wildlife, Inc., appellant in No. 79-2512 and cross-appellee in Nos. 80-1044, 80-1083, and 80-1084. Jeffrey H. Howard, Washington, D. C., also entered an appearance for Defenders of Wildlife, Inc.
 William A. Hutchins, Washington, D. C., with whom Paul A. Lenzini, Washington, D. C., was on the brief for International Association of Fish and Wildlife Agencies, appellee in Nos. 79-2512, 80-1083, and 80-1084, and cross-appellant in No. 80-1044.
 Stephen S. Boynton, Washington, D. C., for Conservation Institute of America, et al., appellee in Nos. 79-2512 and 80-1044, and cross-appellant in Nos. 80-1083 and 80-1084.
 Dirk D. Snel, Atty., Dept. of Justice, Washington, D. C., with whom Angus MacBeth, Deputy Asst. Atty. Gen., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., were on the brief, for the Endangered Species Scientific Authority, et al., appellee. James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., also entered an appearance for the Endangered Species Scientific Authority, appellee.
 Before McGOWAN and EDWARDS, Circuit Judges, and FRIEDMAN,* Chief Judge, United States Court of Claims.
 Opinion for the Court filed by Chief Judge FRIEDMAN, United States Court of Claims.
 FRIEDMAN, Chief Judge:
 
 
 1
 These appeals challenge actions taken by federal agencies responsible for protecting bobcats by limiting their export, pursuant to the obligations of the United States under the Convention on International Trade in Endangered Species of Wild Fauna and Flora, opened for signature March 3, 1973, (1976) 27 U.S.T. 1087, T.I.A.S. No. 8249, --- U.N.T.S. --- (the Convention). After trial, the district court dismissed the major portions of the complaint (which sought injunctive and declaratory relief) but ruled for the plaintiff on some issues. We hold (1) that parts of the government regulation governing the export of bobcat pelts are invalid, (2) that the district court's dismissal of certain portions of the complaint cannot stand because the court did not make findings explaining the reasons for its action, (3) that the court applied the wrong standard of review in its determinations under other portions of the complaint, and (4) that although the court did not explain or discuss the reasons for dismissing still other portions of the complaint, that action was proper since those portions of the complaint do not state claims upon which relief may be granted. Accordingly, we affirm in part and reverse in part the judgment of the district court and remand the case to that court for further proceedings.
 
 I.
 
 2
 A. The Convention on International Trade in Endangered Species of Wild Fauna and Flora and the Actions of the United States in Implementing its Obligations Under the Convention.
 
 
 3
 1. More than 50 nations (including the United States) agreed upon a treaty (the Convention) to limit international trade in endangered species prior to its becoming effective on July 1, 1975. The Convention contains three appendices listing animals and plants to be protected, and provides for additions and deletions from the appendices. Appendix I covers "all species threatened with extinction." Art. II, para. 1. Appendix II, which this case involves, includes "all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival." Art. II, para. 2. Appendix III covers species that are subject to regulation by a particular country "for the purpose of preventing or restricting exploitation." Art. II, para. 3. The parties to the treaty agree that they "shall not allow trade in specimens of species included in Appendices I, II and III except in accordance with the provisions of the present Convention." Art. II, para. 4.
 
 
 4
 The bobcat was added to appendix II in February 1977. 50 C.F.R. § 23.23 (1979).[1]
 
 
 5
 Article IV, para. 1, of the Convention provides that "(a)ll trade in specimens of species included in Appendix II shall be in accordance with the provisions of this Article." Specimens included in appendix II may be exported only pursuant to an export permit, which may be granted only if "a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species" and a "Management Authority" of the exporting state "is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora." Art. IV, para. 2. The Scientific Authority "shall monitor both the export permits granted by that State for specimens of species included in Appendix II and the actual exports of such specimens." Art. IV, para. 3. "Whenever a Scientific Authority determines that the export of specimens of any such species should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I, the Scientific Authority shall advise the appropriate Management Authority of suitable measures to be taken to limit the grant of export permits for specimens of that species." Art. IV, para. 3.
 
 
 6
 2. In section 8(e) of the Endangered Species Act of 1973, 16 U.S.C. § 1537(e) (1976), Congress directed the President to designate the Scientific and Management Authorities under the Convention. By Executive Order No. 11,911, dated April 13, 1976, 41 Fed.Reg. 15,683, the President established the Endangered Species Scientific Authority (Scientific Authority) as the Scientific Authority under the Convention and designated the Secretary of the Interior as the Management Authority under the Convention.[2] The Secretary delegated his authority as Management Authority to the Fish and Wildlife Service.
 
 
 7
 In 1977, the Fish and Wildlife Service, as the Management Authority, published regulations governing, inter alia, the issuance of export permits for species listed in appendix II. These regulations, contained in 50 C.F.R. parts 13 and 23, describe the agency's procedures for dealing with those permits. They state the information required in applying for permits, the criteria for issuance of the permits, and the conditions upon which permits will be issued. 50 C.F.R. subpart 23B.
 
 
 8
 In 1978, the Scientific Authority published the information it would "need in order to support a finding in favor of export of bobcat ... taken in 1978-1979." 43 Fed.Reg. 15,098, 15,098. It announced "Guidelines for ESSA Findings in Favor of Export." Id. The Scientific Authority stated that a Working Group had recommended the following:
 
 
 9
 MINIMUM REQUIREMENTS FOR BIOLOGICAL INFORMATION
 
 
 10
 1. Population trend information * * * the method of determination to be a matter of State choice.
 
 
 11
 2. Information on total harvest[3] of the species.
 
 
 12
 3. Information on distribution of harvest.
 
 
 13
 4. Habitat evaluation.
 
 
 14
 As an interim alternative to the above, the ESSA may rely primarily upon past reported harvest. This approach assumes that yield per unit harvest effort will decrease with population decline. Such an assumption of density dependence is intuitively reasonable, but has not been proven. Furthermore, this method by itself does not estimate the level at which the population is maintained. However, data on total harvest and yield per unit effort are relevant and can be very useful in ESSA findings, particularly if harvest is reported accurately, and if data indicate harvest effort of individual trappers, hunters and collectors, as well as total numbers engaged in harvest.
 
 
 15
 Id. 15,099. The Authority stated that in other states where "available population and harvest information is lacking, is very limited, or indicates that past harvest has been detrimental ... management practices must ensure conservation of these species, consistent with the preceding section." Id. It noted that the following "management initiatives" by a state "could weigh heavily in favor of a finding of no detriment by the ESSA:"
 
 
 16
 1. There should be a controlled harvest * * * methods and seasons to be a matter of State choice.
 
 
 17
 2. All pelts should be registered and marked.
 
 
 18
 3. Harvest level objectives should be determined annually.
 
 
 19
 Id.
 
 
 20
 From the outset, the Scientific Authority has evaluated the impact of exports of bobcats (and other species) upon the survival of the species "on a State-by-State assessment of the status of each species," because the Scientific Authority concluded that the "variation among the States in species status indicated that such an individualized approach would best give the ESSA the necessary basis for finding whether export would not be detrimental to the survival of the species." 42 Fed.Reg. 43,730, 43,730 (1977).
 
 
 21
 In a Notice of Preliminary Findings and Request for Comment, released in 1977, the Scientific Authority stated that "the development of more adequate management and regulation of these species in many States would lead the ESSA to many more findings in favor of international commercial export than is now possible." Id. 43,731. The Authority concluded that it was "unable to find that international commercial export of bobcat pelts or products of animals taken from the wild during the 1977-78 season anywhere in the United States after the date of this notice will not be detrimental to the survival of the species." Id. 43,732. Finally, it set out the information that it had regarding the status of the bobcat population (and that of three other animal species) on a state-by-state basis. Id. 43,735-64.
 
 
 22
 Following the publication of the preliminary findings, the states and various groups submitted data and comments. In its final findings concerning the export of bobcats (and other species) for the 1977-78 season, the Scientific Authority indicated that "methods must be established to provide the ESSA with sufficient evidence to make determinations as to whether export of specimens will be detrimental to the survival of that species." 43 Fed.Reg. 11,082, 11,085 (1978). It noted that because the bobcat is elusive, information regarding "population size and trends(,) habitat quality, quantity, and trends, and the true extent of hunting and trapping pressure on that population" "is especially scanty." Id. 11,086. The Authority stated that "(b)ecause of the variability in the information available as well as in the management schemes used by different States, the ESSA, for this year, was unable to use a single set of criteria in determining whether a given harvest level would not be 'detrimental to the survival of the species.' " Id. On the basis of the information the states had submitted, the Scientific Authority set export quotas for most of the states and the Navajo Nation. Id. 11,086-90. Initially, it approved the export of up to 76,000 bobcat pelts from 29 states and the Navajo Nation; subsequently it approved the export of an additional 3,350 pelts from two other states. 43 Fed.Reg. 29,470, 29,471 (1978).
 
 
 23
 The Scientific Authority has stated that recent informal estimates are that 80-90 percent of the bobcat pelts taken in this country are exported. 44 Fed.Reg. 40,842, 40,843 (1979).
 
 
 24
 For the 1978-79 season, the Scientific Authority, without setting numerical quotas, approved for most states and the Navajo Nation the export of pelts taken in compliance with state laws and set quotas of 2,000 and 6,000, respectively, for two states. 43 Fed.Reg. 39,306, 39,306-11, 39,316 (1978).
 
 
 25
 This case involves the export quotas for the 1979-80 season approved by the Scientific Authority. In its advance notice of proposed rule-making for that season, the Scientific Authority said that it would "continue to follow" the guidelines it had published in 1978 for "findings in favor of export" (44 Fed.Reg. 25,384, 25,385 (1979)), which we have set forth at pages 6-7 supra. Applying those standards, the Scientific Authority in its final findings, issued in September 1979, approved the export from 34 states and the Navajo Nation of bobcats taken in accordance with state law and set a quota for one state of 8,000. 44 Fed.Reg. 55,540, 55,546-47 (1979) (to be codified in 50 C.F.R. § 23.52).
 
 
 26
 B. The Present Case.
 
 
 27
 Two months after the Scientific Authority took its final action approving the quotas for the 1979-80 season, the Defenders of Wildlife, Inc. (Defenders) (a nonprofit organization engaged in protecting, conserving, and enhancing wildlife and wild lands) filed a complaint in the United States District Court for the District of Columbia against the Scientific Authority and its members, the Department of the Interior and its Secretary, and the Fish and Wildlife Service and its Director (the federal defendants). The complaint sought a declaratory judgment that the Scientific Authority's guidelines and its findings approving the export of bobcats for 1979-80 and the Fish and Wildlife Service's management regulations implementing the Convention are invalid. The complaint also sought an injunction against the federal defendants' approving the export of bobcats for 1979-80 and granting any permits therefor. The complaint contained six separate claims for relief, discussed below, each of which challenged the government's regulation of bobcat exports on a different ground.
 
 
 28
 The district court granted a temporary restraining order barring the export of bobcats. It consolidated the evidentiary hearing on the request for a preliminary injunction with a trial on the merits. At the close of the plaintiff's case, the district court dismissed the complaint with respect to the export of bobcats from 26 states and the Navajo Nation. After the defendants introduced evidence, the court set aside the Scientific Authority's findings that no detriment would result from the export of bobcats taken in five states and in portions of two other states, and granted injunctive relief with respect to those states. It dismissed the complaint with respect to the two remaining states, for which it upheld the no-detriment findings.
 
 II.
 
 29
 There are three threshold questions we must consider before reaching the merits:
 
 
 30
 A. Intervenor-defendant International Association of Fish and Wildlife Agencies contends that article IV of the Convention did not give the Defenders any judicially enforceable rights. It argues that the Convention is not a self-executing treaty but requires implementation by Congress, and that Congress did not implement it. Although the federal defendants made a similar argument in their brief, at oral argument they receded from that position and conceded that Congress had implemented the Convention.
 
 
 31
 We find it unnecessary to determine whether the Convention was self-executing, since we conclude that Congress implemented it.
 
 
 32
 In section 8(e) of the Endangered Species Act of 1973 (16 U.S.C. § 1537(e) (1976)), Congress provided that the agencies it directed the President to designate as the Scientific and Management Authorities "pursuant to the Convention," "shall thereafter be authorized to do all things assigned to them under the Convention, including the issuance of permits and certificates."
 
 
 33
 The legislative history of that Act confirms that Congress thereby intended to implement the Convention. The Senate Committee Report on the bill stated:
 
 
 34
 (O)ne of the purposes of the bill is to take all appropriate steps to implement the Nation's international commitments. To further this intent, the bill provides a means for implementation of the regulations of the Convention on International Trade in Endangered Species of Wild Fauna and Flora if and when that Convention is ratified by the Senate. (The Senate did so in August 1973.) ... The Committee found that (the regulatory structure agreed to in the Convention) would further the purposes of the (Endangered Species) Act regarding international cooperation. (The bill), therefore, provides the means to establish the appropriate management and scientific authorities....
 
 
 35
 S.Rep.No. 93-307, 93d Cong., 1st Sess. 5, reprinted in (1973) U.S.Code Cong. & Ad.News 2989, 2994.
 
 
 36
 During the debate on the bill, Senator Tunney explained that it provided "mechanisms for implementation" of the Convention. 119 Cong.Rec. 25,670 (1973). Senator Williams stated that the bill provided "the means with which to carry out the provisions of the convention." 119 Cong.Rec. 25,676 (1973). See also 119 Cong.Rec. 30,164 (1973) (remarks of Rep. Goodling); Sen.Exec.Rep.No. 93-14, 93d Cong., 1st Sess. 3 (1973).
 
 
 37
 Similarly, when Congress amended the Endangered Species Act in 1979 to designate the Secretary of the Interior as both the Scientific Authority and the Management Authority "for purposes of the Convention" (see note 2, supra), it provided that "(t)he Secretary shall do all things necessary and appropriate to carry out the functions of the Management Authority ... (and) of the Scientific Authority under the Convention." 16 U.S.C. § 1537a(b)-(c) (Supp. III 1979).
 
 
 38
 Since in section 8(e) of the Endangered Species Act Congress implemented the Convention, the Convention "can be a source of rights enforceable by an individual litigant in a domestic court of law." People of Saipan v. United States Department of Interior, 502 F.2d 90, 97 (9th Cir. 1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). See Diggs v. Richardson, 180 U.S.App.D.C. 376, 379, 555 F.2d 848, 851 (1976).
 
 
 39
 B. The federal defendants argue that because the Convention provides merely generalized standards for the export of bobcats and Congress has neither implemented the substance of nor particularized those standards, there is no meaningful basis for testing either the Scientific Authority's guidelines for determining permissible export levels or the agency's approval of bobcat exports. For these reasons the federal defendants apparently conclude that there cannot be judicial evaluation of either the guidelines or the findings approving bobcat exports and that therefore the Defenders have not stated any legally cognizable claim.
 
 
 40
 Section 10(e) of the Administrative Procedure Act, however, authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). If any of the guidelines and actions of the Scientific Authority are arbitrary and capricious and not in accordance with law because not in conformity with the Convention, section 10(e) authorizes us to invalidate them and set them aside. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). We cannot conclude, as the federal defendants argue, that in the absence of further congressional implementation, compliance with the Convention is left to the political branch of the government.
 
 
 41
 C. Although no party argues that the case is moot, we must consider this issue since "(m)ootness is a judicial question because the Court 'is not empowered to decide moot questions or abstract propositions.' " North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).
 
 
 42
 The complaint sought relief against the export of bobcats in 1979-80, the Scientific Authority's guidelines and the Fish and Wildlife Service's regulations implementing the Convention. The mootness issue arises because the export of bobcats for the 1979-80 season is over. We construe the complaint, however, as amplified by the arguments in the Defenders' brief, as not limited to challenging the 1979-80 export determinations, but more broadly as attacking the standards federal agencies apply in approving bobcat exports. As thus interpreted, the case is not moot.
 
 
 43
 Moreover, even if the challenge were only to the exports for the single season, the case would not be moot. Here the exception to the doctrine of mootness for short-term orders that are "capable of repetition yet evading review" (Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)) applies because "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). Indeed, in its recently published notice of preliminary findings for the export of bobcats (and other animals) for the 1980-81 season, the Fish and Wildlife Service (which has succeeded the Endangered Species Scientific Authority as the Scientific Authority under the Convention, see note 2, supra), stated that it "is applying the same criteria and is seeking essentially the same types of information as requested by the ESSA in developing advice for the 1980-81 season on whether export will not be detrimental to the survival of the species." 45 Fed.Reg. 64,520 (1980). These are the same criteria that the Defenders challenge in this case.III.
 
 
 44
 At the close of the plaintiff's case, the district court, in response to a motion to dismiss, dismissed the complaint insofar as it related to the export of bobcats from 26 states and the Navajo Nation. The court made no findings. The only explanation the court gave with respect to that dismissal was the following two sentences from the court's memorandum opinion dealing with the remaining states involved:
 
 
 45
 Upon conclusion of plaintiff's case, the Court dismissed the complaint with regard to the Navajo Nation and all states at issue except Wyoming, Oregon, New Mexico, Massachusetts, Wisconsin, North Dakota, South Dakota, Texas and Florida. The Court concluded that plaintiff had failed to show that defendants had acted improperly with regard to the Navajo Nation and the other states at issue herein.
 
 
 46
 Rule 41(b) of the Federal Rules of Civil Procedure provides that upon the completion of the plaintiff's case in a nonjury trial, in response to a motion to dismiss, the district court may "render judgment against the plaintiff" and, if it does so, "the court shall make findings as provided in Rule 52(a)." The latter rule provides that in all actions tried upon the facts without a jury "the court shall find the facts specially and state separately its conclusions of law." Findings and conclusions may be incorporated in any opinion or memorandum of decision the court may file.
 
 
 47
 The single sentence quoted above in which the court gave its reasons for dismissing the complaint with respect to the 26 states and the Navajo Nation that the "plaintiff had failed to show that defendants had acted improperly with regard to" those entities does not satisfy the requirements of Rule 41(b). The district court's conclusory statement fails to provide us with an adequate basis upon which we can review its ruling dismissing the major part of the complaint. We do not know what standards the court applied in determining whether the "defendants had acted improperly," whether the dismissal rested upon a failure of factual proof or a lack of any showing that the federal defendants applied the wrong legal standard, or what the court believed to be the proper standards for the Scientific Authority to use in making its determination of no detriment.
 
 
 48
 Although the complaint challenged both the guidelines of the Scientific Authority and the latter's approval of bobcat exports for the 1979-80 season, even with respect to the states for which it held for the plaintiff, the district court's memorandum discussed only exports, and its order similarly covered only that subject.
 
 
 49
 Accordingly, the portion of the district court's decision dismissing the complaint insofar as it related to the 26 states and the Navajo Nation must be reversed, and the case remanded to that court to enter findings of fact and conclusions of law that adequately explain the grounds of its decision. It should make these findings and conclusions in accordance with the standards we set forth in the next part of this opinion.
 
 IV.
 
 50
 The Defenders' principal contention, contained in their second claim for relief, is that the Scientific Authority's 1978 guidelines for "Findings in Favor of Export" are arbitrary, capricious, and illegal because "they do not require adequate scientific data to support such findings." In their third claim for relief the Defenders challenge the Scientific Authority's findings approving bobcat exports for the 1979-80 season as "not supported by adequate scientific data." A common thread links these two claims: the Defenders contend that the Scientific Authority uses a standard for approving bobcat export that is impermissible under the Convention because it does not permit an informed judgment about the impact of the killings upon the species. More specifically, the Defenders claim that unless the total population of bobcats can be estimated with reasonable accuracy and the total number of killings ascertained, it is impossible to determine what effect the killings will have upon the survival of the species.
 
 
 51
 A. As stated above (pp. 172-173 supra), the Scientific Authority's 1978 guidelines announced the following minimum kinds of biological information that permit findings in favor of export: (1) population trend information; (2) information on total number of killings; (3) information on the distribution of killings; and (4) evaluation of the habitat of bobcats. The guidelines further stated that in states where the available data on population and killings were very limited or indicated that past killings had been detrimental to the species, "management practices must ensure continuation of these species" and that state "management initiatives" that "could weigh heavily in favor of a finding of no detriment by the ESSA" were (1) that the killings should be "controlled," with the methods and means therefor to be left to the state to choose, (2) that all pelts should be registered and marked, and (3) that killing level objectives should be determined annually.
 
 
 52
 These are not adequate bases upon which the Scientific Authority can carry out its obligations to implement the Convention. Under the Convention, export permits for animals listed in appendix II, such as the bobcat, may be granted only if the Scientific Authority advises that the proposed exports "will not be detrimental to the survival of that species." Animals listed in appendix II are those which, although not now threatened with extinction, "may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival."
 
 
 53
 We do not see how, without adequate information on total bobcat population and the number to be killed in a particular season, the Scientific Authority can make a valid determination of "no detriment." For example, the Scientific Authority set a quota for the 1978-79 season of 2,000 bobcats to be killed in Wyoming. If Wyoming had a total population of only 2,500 bobcats, the killing of 2,000 would have a devastating impact upon the survival of the species there. Conversely, if the state had a population of 50,000 animals, the killing of 4 percent of the bobcats probably would not pose a serious threat to survival. Unless the total bobcat population is known, however, it is impossible to predict the effect upon bobcat survival of the killing of a specified number.
 
 
 54
 It is similarly impossible to make an informed and therefore valid finding of "no detriment" without knowing the total number of animals to be killed. The impact of killing upon the survival of the species depends upon both the population and the extent to which the killing will reduce that population. The proposed killing of a substantial number of bobcats may have only a minimal effect upon the species if the total bobcat population is large. Conversely, the killing of only a small number of animals may have a serious impact if the total number of bobcats is small. The two factors population and number to be killed are so interrelated that a valid finding of "no detriment" cannot be made without adequate data about both of them.
 
 
 55
 The guidelines, however, contemplate and permit no-detriment findings without that information. The "(p)opulation trend information," upon which the Scientific Authority relies, ordinarily is based largely upon the number of past killings and the inference that the total number of bobcats has not been thereby significantly reduced because animals of varying ages and sexes continued to be killed in similar numbers. These are not sufficient grounds upon which to base a no-detriment finding. Unless the size of the population is known, the effect of any trend toward a change in that population is too conjectural and speculative to permit proper evaluation of its effect upon the species.
 
 
 56
 In all but two of the states, the Scientific Authority's no-detriment findings for the 1979-80 killings did not even specify the maximum number of bobcats that could be killed. Instead, the Authority merely authorized "pelts legally taken during 1978-79 season." 43 Fed.Reg. 39,309. The fact that the animals were killed in compliance with state laws does not justify the inference that the killing will have no detriment upon the survival of the species. The Convention makes it the obligation of the Scientific Authority, not the states, to make that determination, and the Scientific Authority cannot avoid that obligation by deferring to the limits upon killing the states have imposed.
 
 
 57
 The Scientific Authority relies upon a state's "management initiative" to protect the species as a critical guideline for finding no detriment in situations where adequate population and killing information is unavailable or where information about past killings raises a serious question about the effect of those killings on the survival of the species. This is not an adequate substitute for the actual facts concerning population and number of killings, which are required before an informed judgment concerning the impact of the killings can be made. If the Scientific Authority does not have that information, it cannot make a valid no-detriment finding. The Scientific Authority cannot substitute for the factual basis necessary to support a no-detriment finding the belief or hope that a state management program somehow will insure the survival of the species.
 
 
 58
 Any doubt whether the killing of a particular number of bobcats will adversely affect the survival of the species must be resolved in favor of protecting the animals and not in favor of approving the export of their pelts. Article II, paragraph 2(a), of the Convention recognizes that trade in animals listed in appendix II is to be "subject to strict regulation in order to avoid utilization incompatible with their survival." The various notices and findings of the Scientific Authority that we have described in part I.A.2. of this opinion, however, suggest the opposite attitude. The approach of the Scientific Authority often seemed primarily concerned with an acceptable basis for authorizing bobcat exports despite the absence of convincing factual grounds for making no-detriment findings.
 
 
 59
 We recognize that, because of the secretive nature of the bobcat's life and behavior, it is difficult to obtain accurate information about the size of the bobcat population. There are indications that techniques for making more accurate population estimates can and may be developed. We do not suggest that the Scientific Authority may base a no-detriment finding only upon some kind of head count of the animals or some other method of measurement that, as a practical matter, would be virtually impossible to make. All the Scientific Authority is required to do is to have a reasonably accurate estimate of the bobcat population before it makes a no-detriment finding. The Scientific Authority has considerable discretion to determine the method by which that estimate may be made and in evaluating its reliability.
 
 
 60
 We hold, however, that the Scientific Authority cannot make a valid no-detriment finding without (1) a reliable estimate of the number of bobcats and (2) information concerning the number of animals to be killed in the particular season. If that material is not presently available, the Scientific Authority must await its development before it authorizes the export of bobcats.
 
 
 61
 B. To the extent that the Scientific Authority's no-detriment findings for the 1979-80 season do not reflect both the bobcat population and the number of animals to be killed, they cannot stand. There is no indication, however, that the district court reviewed the Scientific Authority's findings under that standard.
 
 
 62
 As we have noted, the court gave no adequate explanation of its reasons for dismissing the complaint at the close of the plaintiff's case with respect to 27 jurisdictions. After the defendants introduced their evidence covering the remaining nine states, the district court set aside the no-detriment findings for five of them and portions of two others, and upheld the findings for the remaining two states. The court made brief findings, each comprising a short paragraph dealing with each of the nine states. None of the district court's findings applied the principles we have set forth in part IV.A. of this opinion, and accordingly they cannot be upheld.
 
 
 63
 Indeed, some of the findings suggest that instead of evaluating the administrative record to determine whether the no-detriment findings were arbitrary and capricious, the district court made its own findings on the basis of the evidence presented to it. For example, the court gave the following explanation of its conclusion that "defendants have acted within their legitimate authority" in making the no-detriment finding for Wyoming:
 
 
 64
 The Court does not reach this conclusion easily in view of the testimony of Mr. Richard Randall, who provided a valuable firsthand account of the decline of bobcats in certain areas of the state. However, the Court concludes that his testimony is outweighed by that of Dr. Crowe of the Planning Section of the Wyoming Game and Fish Department. Dr. Crowe displayed impressive knowledge of the bobcat and its habitat in Wyoming. His detailed analysis of harvest data bespeaks sound management policy and adequately supports ESSA's no-detriment finding. The Court anticipates that Wyoming will continue to gather data regarding the status of the bobcat population within its borders.
 
 
 65
 This analysis suggests that the court reviewed the no-detriment findings on the basis of its own evaluation of the conflicting testimony at the trial rather than on the administrative record. The district court thus appears to have followed the procedure that the Supreme Court condemned in Camp v. Pitts, supra, as an inappropriate standard of review in a case such as this: "to hold a de novo hearing ... and thereafter determine whether the agency action was 'unwarranted by the facts.' " 411 U.S. at 141, 93 S.Ct. at 1243. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 415, 420-21, 91 S.Ct. at 823, 825-826. As Camp v. Pitts explained, if the court concludes that
 
 
 66
 there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a de novo hearing but, as contemplated by Overton Park, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.
 
 
 67
 411 U.S. at 142-43, 93 S.Ct. at 1244.
 
 
 68
 The administrative record in this case is substantial. The parties have stipulated that plaintiff's exhibit 9, which contains the submissions of all of the jurisdictions in support of their applications for bobcat export permits, constitutes that record. These submissions contain a great amount of information about bobcats. On the remand, the district court should review this material, as explained by the evidence at trial, to determine whether the no-detriment findings for each of the 36 jurisdictions were " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' as specified in 5 U.S.C. § 706(2)(A)." Camp v. Pitts, supra, 411 U.S. at 142, 93 S.Ct. at 1244.
 
 V.
 
 69
 The Defenders challenge the actions of the federal defendants on several other grounds. Since the district court did not address these contentions, our normal practice would be to remand for that court to do so. The contentions raise only questions of law, however, the resolution of which does not depend upon or require analysis of the lengthy record. Moreover, the answers to the questions are not difficult. In the circumstances, and to expedite the ultimate conclusion of this litigation, we decide the issues ourselves.
 
 
 70
 A. In their first claim for relief, the Defenders contend that the Scientific Authority's no-detriment findings were invalid because the Convention required the agency to evaluate the impact of the proposed killings upon subspecies of bobcats in addition to the species as a whole. The Defenders also present the related argument that making the no-detriment findings on a state-by-state basis resulted in inadequate protection for the subspecies, also allegedly in violation of the Convention.
 
 
 71
 1. For their first argument, the Defenders rely primarily upon article I of the Convention, which defines species as "any species, subspecies, or geographically separate population thereof." The substantive provision of the Convention that governs the making of no-detriment findings by the Scientific Authority, however, is not article I but article IV, which applies to trade in "any specimen of a species included in Appendix II." Only the bobcat, and not any of its subspecies, is listed in appendix II. In contrast, appendix II to the original Convention did list subspecies for other animals. For example, three subspecies are listed for alligators, and three subspecies each for two different species of the cat family. In addition, one subspecies of bobcat is listed in appendix I.
 
 
 72
 We interpret these provisions of the Convention to authorize the listing of separate subspecies in appendix II but not to require the Scientific Authority to treat separately each subspecies where only the species is listed. The number of subspecies in the animal kingdom is substantial, and the different varieties often are difficult to identify.[4] It is unlikely that the parties to the Convention intended to require their Scientific Authorities to make findings with respect to every subspecies of every species that is included in the three appendices to the Convention. The more likely explanation of the definition of species is to make it clear that if the parties to the Convention want to accord the protection of the Convention to a separate subspecies by listing it as an appendix, they may do so. The Scientific Authority has interpreted the Convention as not requiring it to make findings for unlisted subspecies. This interpretation, by the agency that implements and applies the Convention, is entitled to substantial weight. Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); National Indian Youth Council v. Bruce, 485 F.2d 97, 99 (10th Cir. 1973), cert. denied, 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); Shafter v. United States, 273 F.Supp. 152, 157-58 (S.D.N.Y.1967), aff'd per curiam, 400 F.2d 584 (2d Cir. 1968), cert. denied, 393 U.S. 1086, 89 S.Ct. 871, 21 L.Ed.2d 779 (1969).
 
 
 73
 2. The Defenders further contend that the Scientific Authority's state-by-state findings do not adequately protect the subspecies because bobcats do not limit themselves to particular states. As stated earlier, from the beginning, the Scientific Authority has made its no-detriment finding on a state-by-state basis because it concluded that the "variation among the States in species status indicated that such an individualized approach would best give the ESSA the necessary basis for finding whether export would not be detrimental to the survival of the species." 42 Fed.Reg. 43,730, 43,730 (1977).
 
 
 74
 The Defenders' argument assumes, contrary to our holding, that the Scientific Authority is required to evaluate the impact of the killings upon subspecies of bobcats. Moreover, the Defenders have not demonstrated that such an analysis would provide greater protection to the bobcat than the state-by-state basis the Scientific Authority uses if the latter basis reflects the standards we have announced. The states have comprehensive and extensive wildlife protection and conservation programs. We cannot say that the Scientific Authority acted arbitrarily or capriciously, or abused its discretion, in making its detriment determinations state-by-state.
 
 
 75
 B. The Defenders' three other contentions all relate to the alleged failure of the Management Authority (the Fish and Wildlife Service) properly to perform its duties under the Convention. The Convention requires that before export permits may be granted for species included in appendix II, the Management Authority must be "satisfied that the specimen was not obtained in contravention of the laws of (the exporting) State for the protection of fauna and flora." Article IV, para. 2. The Scientific Authority is required to monitor the "export permits granted" for species included in appendix II "and the actual exports of such specimens." Article IV, para. 3. As noted, the Management Authority has promulgated detailed regulations governing its responsibilities under the Convention.
 
 
 76
 The Defenders contend that the Scientific Authority did not adequately perform its monitoring duties because it relied upon information supplied by the Management Authority that was inadequate, that the Scientific Authority's no-detriment findings are arbitrary because based upon the false assumption that the Management Authority prevents the export of bobcats killed in violation of state or federal law, and that the Management Authority's regulations are arbitrary and capricious because they do not adequately protect the bobcat.
 
 
 77
 The Defenders support these contentions primarily upon the basis of the deposition of Richard M. Parsons, the Chief of the Federal Wildlife Permit Office in the Fish and Wildlife Service, the Management Authority under the Convention. The deposition, however, was never admitted into evidence and therefore is not properly before us.
 
 
 78
 At the trial the Defenders offered the entire deposition into evidence as plaintiff's exhibit 1. The federal defendants did not object, but suggested that only designated portions should be introduced. The district court agreed, indicating that written "page designations and line designations" should be filed. This was never done, however, and the Clerk's list of exhibits in the case does not include exhibit 1. Some of the exhibits to the deposition were admitted in evidence.
 
 
 79
 In their opening brief the Defenders admitted that "the deposition of Mr. Parsons was never formally received into evidence," but attempted to excuse this as "a mere technical oversight" and urged that the deposition "was effectively received into evidence." It was incumbent upon plaintiff, however, to insure that the portions of the deposition upon which it relied were admitted into evidence. The plaintiff had ample opportunity to do so, and it cannot now excuse its failure as a "mere technical oversight." For purposes of this appeal the Parsons deposition is not a part of the record before us, and we decline to consider it. Cf. Drake v. General Finance Corp., 119 F.2d 588, 589 (5th Cir. 1941); Steger v. Cameron, 71 U.S.App.D.C. 202, 205, 109 F.2d 347, 350 (1939).
 
 
 80
 Without the Parsons deposition, there is no basis upon which the Defenders can argue that the Management Authority failed to perform its duties under the Convention. In any event, many of the Defenders' objections to the Management Authority's activities lose their significance as a result of our holding that the Scientific Authority may make valid no-detriment findings only upon the basis of reliable estimates of bobcat population and data on the number of animals to be killed.
 
 
 81
 Accordingly, we affirm the judgment of the district court insofar as it dismissed the first, fourth, fifth, and sixth claims for relief of the complaint.
 
 VI.
 
 82
 The Defenders challenge certain procedural rulings of the district court as requiring reversal and a new trial.
 
 
 83
 A. The Defenders contend that the court improperly curtailed their cross-examination of Dr. Brown, the Executive Secretary of the Scientific Authority, a government witness. The facts about this ruling are as follows:
 
 
 84
 The trial originally had been scheduled to last 3 days. Because plaintiff took nearly 2 1/2 days to present its direct case, the court extended the time limit to mid-afternoon on the fourth day. This was further extended to permit cross-examination of Dr. Brown. Late in the afternoon of the final day, the following colloquy occurred:
 
 
 85
 THE COURT: You know, I don't want to cut your cross examination short one little bit, but this case is going to finish today and if you want to make any kind of summations we are not going to sit beyond 6 o'clock.
 
 
 86
 I think there comes a time when all things must come to an end and I want you to get the picture. At 6 o'clock we are stopping.
 
 
 87
 MR. HOWARD (Attorney for plaintiff): Very well, Your Honor. One more question on South Dakota.
 
 
 88
 Tr. 841. As 6 o'clock neared, the deadline was further discussed:
 
 
 89
 MR. HOWARD: Your Honor, I just don't think it's possible to ask even two questions about each of the remaining four states that Dr. Brown has testified to on direct.
 
 
 90
 THE COURT: I think he's I am not sure you need it from what he said on direct.
 
 
 91
 MR. HOWARD: May I have the Court's indulgence just one moment.
 
 
 92
 THE COURT: Yes.
 
 
 93
 MR. HOWARD: In view of the Court's 6 o'clock time limit, we will close our cross-examination at this time. Thank you.
 
 
 94
 MR. BERLIN: I have no redirect, Your Honor.
 
 
 95
 Tr. 851-52.
 
 
 96
 The government's direct examination of Dr. Brown filled 64 pages of the transcript (Tr. 739-803), while plaintiff's cross-examination filled 49 pages (Tr. 803-52).
 
 
 97
 Although Rule 46 of the Federal Rules of Civil Procedure makes "formal exception" unnecessary, it does require "that a party, at the time the ruling or order of the court is made or sought, (make) known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor." Where, as here, counsel indicates begrudging acceptance of the court's ruling, there has not been a proper objection, and the ruling cannot be assigned as error on appeal. Krienke v. Illinois Central Railroad, 249 F.2d 840, 845 (7th Cir. 1957) ("All right."); Fort Worth & Denver Railway Co. v. Roach, 219 F.2d 351, 352 (5th Cir. 1955) ("Very well, Your Honor.").
 
 
 98
 In any event, we cannot say that in all the circumstances of this case the district court abused its discretion in bringing the trial to a close by 6 p. m. of the fourth day.
 
 
 99
 B. The Defenders next object to the district court's refusal to permit them to make an opening argument, and contend that the court's imposition of the 6 p. m. deadline on the last day of trial prevented them from making a closing argument. This was a trial to the court, however, and the plaintiff had submitted a pretrial brief setting forth its contentions. The district court did not abuse the broad discretion it has to determine whether to permit opening and closing statements. Cf. United States v. DeLoach, 164 U.S.App.D.C. 116, 120, 504 F.2d 185, 189 (1974), cert. denied, 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976); Clark Advertising Agency v. Tice, 490 F.2d 834, 836-37 (5th Cir. 1974); United States v. Sawyer, 143 U.S.App.D.C. 297, 298, 443 F.2d 712, 713 (1971).
 
 
 100
 C. Finally, the Defenders object to the district court's alleged striking of part of the testimony of Dr. Grandy, one of their witnesses. Dr. Grandy testified on direct examination that no-detriment findings on a state-by-state basis would be inadequate to protect bobcat subspecies. The defendants objected to this statement to the extent that it referred to states for which Dr. Grandy had not studied the data that the states had submitted to the Scientific Authority. The district court apparently sustained the objection, and the Defenders contend that the court subsequently struck those portions of Dr. Grandy's testimony.
 
 
 101
 It is unclear from the transcript whether the district court did so. If the district court struck portions of Dr. Grandy's testimony, however, the Defenders were not prejudiced by that action in view of our conclusion that the Scientific Authority is not required to make findings with respect to bobcat subspecies, and that even with respect to the bobcat itself, state-by-state findings are sufficient. In any event, we cannot say that there was an abuse of the trial court's discretion to limit the expert's testimony to those states with respect to which the expert was familiar with the underlying data. See Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); Perkins v. Volkswagen of America, Inc., 596 F.2d 681, 682 (5th Cir. 1979); N. V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp., 590 F.2d 415, 418-19 (2nd Cir. 1978).
 
 CONCLUSION
 
 102
 The guidelines of the Endangered Species Scientific Authority are invalid and are set aside to the extent they authorize findings that the export of bobcats would not be detrimental to the survival of the species that are not based upon reliable estimates of the bobcat population and data showing the total number of bobcats to be killed, in each of the states involved. The judgment of the district court is affirmed insofar as it dismissed the first, fourth, fifth, and sixth claims for relief of the complaint. The judgment of the district court with respect to the second and third claims for relief of the complaint is vacated, and the case is remanded to that court for further proceedings on those claims in accordance with the principles announced in this opinion.
 
 
 103
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 This was done by listing in appendix II all species of cats except those in appendix I. One subspecies of bobcat had been listed in appendix I in July 1975. 50 C.F.R. § 23.23 (1979)
 
 
 [2]
 In 1979, Congress amended the Endangered Species Act to designate the Secretary of the Interior as both the Management and the Scientific Authority under the Convention. It further provided that the functions of each authority should be carried out by the United States Fish and Wildlife Service. 16 U.S.C. § 1537a (Supp. III 1979). See pp. 174-175 infra
 
 
 [3]
 Although the defendants use the word "harvest" to describe the taking of bobcat, we use the more candid term "killing."
 
 
 [4]
 The defendants' expert witness, Dr. Peterson, a zoologist specializing in the ordering of specimens into taxonomic units, including subspecies, testified that bobcat subspecies could be identified only on the basis "of a critical analysis of cranial features," and that it was "impossible" to identify "by sight" a bobcat as a member of a particular subspecies