The **HUMANE SOCIETY OF the UNITED STATES, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Lee M. Thomas, Administrator of the Environmental Protection Agency, Respondents.**

No. 83–2336.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1985.

Decided May 2, 1986.

Theodore L. Garrett, Washington, D.C., for petitioner.

Lee R. Tyner, Atty., Dept. of Justice, and William L. Jordan, Atty., E.P.A., with whom Margaret N. Strand, Atty., Dept. of Justice, and Michael S. Winer, Atty., E.P.A., Washington, D.C., were on brief, for respondents.

Before ROBINSON, Chief Judge, and WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

The Environmental Protection Agency (EPA) awarded permits under the Federal Insecticide, Fungicide and Rodenticide Act[1] to the Fish and Wildlife Service of the Department of the Interior, and to the University of California at Davis, authorizing experimental uses of the chemical sodium fluoroacetate. Petitioner, the Humane Society of the United States, asserts that EPA exceeded its statutory authority in doing so.[2] Before addressing that claim, however, we must consider whether jurisdiction to review the challenged action lies originally in this court rather than in a district court and, if so, whether this litigation survives the expiration of the permits during November, 1984. We hold that we have jurisdiction and that the case is not moot, and we affirm the orders conferring the permits.

## I. BACKGROUND

Prior to 1972, sodium fluoroacetate, commonly known as Compound 1080, could legally be employed to destroy animal predators. During that era, ranchers and farmers frequently resorted to this highly toxic compound to reduce the populations of coyotes and other animals preying on livestock. In 1972, however, EPA cancelled all registrations for use of Compound 1080 as a predacide,[3] finding that it also killed animals not targeted.[4] The value of Compound 1080 for coyote control was judged "speculative,"[5] and available alternatives were deemed safer and more effective.[6]

Nearly a decade later, the Fish and Wildlife Service, along with others, petitioned

---

1. 7 U.S.C. §§ 136–136y (1982).

2. Brief for Petitioner at 12. Petitioner also contends that EPA erroneously omitted certain items from the record. See note 99 *infra*.

3. 37 Fed.Reg. 5718 (1972).

4. *Id.* at 5718, 5719.

5. *Id.* at 5719.

6. *Id.*

for reconsideration of the 1972 action.[7] An extensive proceeding followed,[8] and an administrative law judge, in an initial decision,[9] concluded that new evidence emerging since 1972 warranted reconsideration.[10] The judge recommended particular attention to two bait delivery mechanisms nonexistent in 1972[11]—the toxic collar[12] and the single lethal dose bait[13]—and dismissed applications for use of two others.[14]

While some aspects of the initial decision were still pending an administrative appeal, EPA received separate applications from the Fish and Wildlife Service and the University of California at Davis for permits allowing them to perform field experiments with Compound 1080.[15] EPA published notices of the applications in the Federal Register and invited comments.[16] The notices informed readers that EPA, in evaluating these proposals, would "take into account" information collected during the proceeding devoted to reconsideration.[17] EPA received fifteen comments on the two applications, including comments by petitioner in opposition to the permits.[18]

Prior to action on the applications, EPA issued a final decision on re-registration of Compound 1080.[19] The decision modified the 1972 cancellation by ordering submission of additional data on the two delivery mechanisms singled out by the administrative law judge for further examination.[20] A few weeks later, experimental use permits, each valid for one year, were issued to the Service and the University.[21]

The Service's permit authorized it to conduct up to four field trials of single lethal dose baits.[22] The trials were designed to

7. See 46 Fed.Reg. 59,622 (1981).

8. See *Notice of Hearing on the Applications to Use Sodium Fluoroacetate (Compound 1080) to Control Predators* (E.P.A. Oct. 31, 1983) [hereinafter cited as *Final Decision*] at 3, reproduced in Joint Appendix (J.App.) 287.

9. *Notice of Hearing on the Applications to Use Sodium Fluoroacetate (Compound 1080) to Control Predators* (E.P.A. Oct. 22, 1982) [hereinafter cited as *Initial Decision*], reproduced in J.App. 318.

10. *Id.* at 39, J.App. 337 (conclusions ¶ 1).

11. *Id.* at 41, J.App. 338 (conclusions ¶ 10).

12. A toxic collar is a rubber collar with a reservoir containing a solution of Compound 1080. The collar is placed around the neck of a lamb or goat. If that animal is attacked by a coyote—which characteristically bites its prey in the neck—the attacker usually is poisoned. *Final Decision, supra* note 8, at 30, J.App. 314.

13. A single lethal dose bait contains the minimum quantity of Compound 1080 shown in controlled tests to kill 100% of coyotes eating one bait. Brief for Respondents at 13. A piece of meat or fat is laced with Compound 1080 to form the bait. *Final Decision, supra* note 8, at 24, J.App. 308.

14. *Initial Decision, supra* note 9, at 40–41, J.App. 337A–338A (conclusions ¶¶ 7, 8). The judge held that he lacked authority to rule on delivery mechanisms because they were not encompassed by the announcement of the proceeding. *Id.* at 41, J.App. 338 (conclusions ¶ 9).

15. Application of Fish and Wildlife Service (filed June 16, 1983), reproduced in J.App. 18; Application of University of California at Davis (filed Dec. 17, 1981, amended Feb. 8, Mar. 18 and Oct. 29, 1982), reproduced in J.App. 192.

16. 48 Fed.Reg. 39,504 (1983) (application of University of California at Davis); *id.* at 39,505 (application of Fish and Wildlife Service).

17. *Id.* at 39,504, 39,506.

18. See Brief for Respondents at 11.

19. *Final Decision, supra* note 8.

20. In order to generate new data, the decision approved limited use of single lethal dose baits, *id.* at 25, J.App. 309, and toxic collars, *id.* at 30–31, J.App. 314–315. The decision has since been judicially approved. See *National Cattlemen's Ass'n v. EPA*, 773 F.2d 268 (10th Cir.1985).

21. Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. David Trauger, Fish and Wildlife Service (Nov. 18, 1983) (issuing experimental use permit to Fish and Wildlife Service), reproduced in J.App. 1; Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. Walter E. Howard, University of California at Davis (Nov. 21, 1983) (issuing experimental use permit to University of California at Davis), reproduced in J.App. 5.

22. See Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. David Trauger, Fish and Wildlife Service (Nov. 18, 1983) (issuing experimental use permit to Fish and Wildlife Service), reproduced in J.App. 1;

enable researchers to estimate predation rates and to evaluate the impact of Compound 1080 on untargeted animals. The University's permit authorized it to test a new bait delivery unit[23] containing substances especially attractive to coyotes and less enticing to other animals. The permit allowed the University to place up to 600 bait delivery units in three specified California counties, and sanctioned procedures to facilitate identification of animals taking the baits.[24]

The Service's experiment went forward. However, because the University's project was not funded, its permit was not put to use.[25] Upon expiration of the permits in November, 1984, the Service was given a renewal permit,[26] the term of which was later extended to enable continued experimentation.[27] Petitioner has challenged the renewal permit in a separate suit.[28] The University likewise has applied for renewal of its permit, and its application apparently remains pending.[29]

## II. JURISDICTION

We first address EPA's contention that jurisdiction to examine the permit awards resides originally in a district court and not here. Direct judicial review of the agency's action in a court of appeals is precluded unless there is a "controversy as to the validity of [an] order issued by the Administrator [of EPA] following a public hearing."[30] EPA urges us to adopt a literal interpretation of the language imposing the "public hearing" requirement,[31] but we do not write on a clean slate. Following, as we must,[32] our earlier decision in *Environmental Defense Fund, Inc. v. Costle*,[33]

Application of Fish and Wildlife Service (filed June 16, 1983) at G–1, J.App. 34.

**23.** See Attachment to Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. Walter E. Howard, University of California at Davis (Nov. 21, 1983), reproduced in J.App. 8.

**24.** See *id.*; Application of University of California at Davis (filed Dec. 17, 1981) at 23, J.App. 215.

**25.** Memorandum in Support of Motion to Dismiss at 3, *Humane Soc'y of the United State v. EPA*, No. 83–2336 (D.C.Cir.) (filed Feb. 5, 1985) [hereinafter cited as Motion to Dismiss].

**26.** Letter from Douglas D. Campt, Environmental Protection Agency, to Rollin D. Sparrowe, Fish and Wildlife Service (Jan. 8, 1985), Exhibit 1 to Motion to Dismiss, *supra* note 25 (renewing experimental use permit).

**27.** Letter from Steven Schatzow, Environmental Protection Agency, to Dr. Jan E. Riffe, Fish and Wildlife Service (Nov. 6, 1985) (extending permit to May 8, 1986, and stating that permit will not be renewed past that date).

**28.** *Humane Soc'y of the United States v. EPA*, 788 F.2d 793 (D.C.Cir.1986) (order and memorandum).

**29.** Motion to Dismiss, *supra* note 25, at 1 n.1. We have not been informed of any action on the application.

**30.** 7 U.S.C. § 136n (1982), providing in relevant part:
 (a) District court review

Except as is otherwise provided in this subchapter, Agency refusals to cancel or suspend registrations or change classifications not following a hearing and other final Agency actions not committed to Agency discretion by law are judicially reviewable in the district courts.
 (b) Review by court of appeals
 In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part.

An "actual controversy" obviously exists between petitioner and EPA. Petitioner claims that it is "adversely affected" by the permit awards. There is no contention that those awards are not "order[s] issued by the Administrator." Consequently, this court has jurisdiction if the awards "follow[ed] a public hearing." See *Environmental Defense Fund, Inc. v. Costle*, 203 U.S.App.D.C. 340, 343, 631 F.2d 922, 925 (1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981) [hereinafter cited in footnotes as *EDF*].

**31.** Brief for Respondents at 24–25.

**32.** As a panel, we are bound by prior decisions of this court. E.g., *United States v. Doe*, 235 U.S.App.D.C. 99, 101 n.2, 730 F.2d 1529, 1531 n. 2 (1984).

**33.** *Supra* note 30.

we conclude that the litigation is properly before us.

In that case, a party contended that this court lacked jurisdiction of a petition for review of an EPA order denying a formal hearing on a proposal to cancel a pesticide registration,[34] arguing that the "public hearing" envisioned by the Act had never occurred.[35] We acknowledged "the lack of public notice, the absence of public participation, and the lack of any type of oral presentation by the parties."[36] However, an exhaustive exploration of the statutory text, its legislative history, the caselaw and other statutes, together with a consideration of the demands of sound judicial policy,[37] led us to conclude that "[b]ecause the record before us is wholly adequate for judicial review, ... the proceedings, antecedent to the Administrator's order were a 'public hearing' granting this court jurisdiction to review the challenged order."[38] The pivot of our decision was the disclosure in the legislative history that Congress was primarily concerned about an adequate record for review in a court of appeals and had imposed the public-hearing requirement simply as a means to that end.[39] "The legislative history," we said, "demonstrates that underlying the restriction of appellate review to orders following public hearings was congressional concern that review be based on an administrative decision with an adequate record,"[40] and we reasoned "that appellate review was appropriate after a hearing because 'an adequate record exists for such review.' "[41] Since "Congress designed [the] review provisions with the jurisdictional touchstone of the reviewable record in mind,"[42] the crucial inquiry is whether such a record is available.[43]

In the case at bar, notices of the two applications for experimental use permits were published in the Federal Register,[44] and interested parties were invited to sub-

**34.** See 7 U.S.C. § 136d(d) (1982).

**35.** *EDF, supra* note 30, 203 U.S.App.D.C. at 343, 631 F.2d at 925.

**36.** *Id.* at 345, 631 F.2d at 927. The pre-decisional activities consisted only of submission of legal memoranda to an administrative law judge, filing of exceptions to the judge's decision, and presentation of briefs on an administrative appeal. *Id.* at 344, 631 F.2d at 926. There were 186 pages of written argument and supporting exhibits, and a listing of 68 items in the certified index of the record. *Id.*

**37.** See *id.* at 345–350, 631 F.2d at 927–932.

**38.** *Id.* at 350, 631 F.2d at 932.

**39.** *Id.* at 348–349, 631 F.2d at 930–931.

**40.** *Id.* at 349, 631 F.2d at 931 (emphasis omitted).

**41.** *Id.* at 348, 631 F.2d at 930 (quoting S.Rep. No. 838, 92d Cong., 2d Sess. 13 (1972), reprinted in [1972] U.S.Code Cong. & Ad.News 4004) (emphasis omitted).

**42.** *EDF, supra* note 30, 203 U.S.App.D.C. at 350, 631 F.2d at 932.

**43.** *Id.* at 348–349, 350, 631 F.2d at 930–931, 932. We have found only one other case in which a precise definition of "public hearing" in § 136n(b) was undertaken. In *Amvac Chem. Corp. v. EPA,* 653 F.2d 1260 (9th Cir.1980), the court, in a 2–1 pronouncement held that "a decision not to hold a public hearing is not an order issued following a public hearing." *Id.* at 1265. The reason assigned for this ruling was "that the agency action in this matter was procedural in nature—more in the form of a preliminary step to determine the scope of the requested agency hearing." *Id.* at 1263. The majority felt that *EDF* was distinguishable on the ground that the acceptance of written comments by the agency and the holding of a public meeting by a scientific advisory panel of the agency amounted to a hearing. This premise reflects a misreading of our opinion, which explained that these events occurred in an independent proceeding antedating the one leading to the order under review. *EDF, supra* note 30, 203 U.S.App. D.C. at 342, 631 F.2d at 924. Moreover, the majority conceded that the "main thrust of" the Act's legislative history "was to have *final* decisions of the Administrator passed on to the Court of Appeals where there was an adequate administrative record for the Court of Appeals to review the propriety of the action." *Id.* at 1265 (emphasis in original). The dissenting judge "wholeheartedly agree[d]" with our decision in *EDF, id.,* and declared that "[t]he majority holding that the denial of a request for a 6(d) hearing is procedural and hence not reviewable, rather than 'substantive' and reviewable finds no support in either statute or precedent." *Id.* at 1265–1266.

**44.** 48 Fed.Reg. 39,504, 39,505 (1983).

mit written comments.[45] The notices announced that information collected in the proceeding concerning re-registration of Compound 1080 [46] would also be considered in deciding whether the sought-after permits should issue.[47] As a result, EPA received comments from fifteen interested parties,[48] amassed over 20,000 pages of testimony and exhibits,[49] and has included 178 items in the certified index [50]—a record wholly adequate for appellate review. It is of no consequence that much of this record was compiled during the hearings on re-registration, for parties interested in the two applications for experimental use permits, whether or not submitting comments thereon, could reasonably rely upon EPA's published commitment to take account of evidence adduced in other proceedings dealing with Compound 1080. EPA cannot now attempt to exclude that evidence from consideration in determining our jurisdiction here.

We do not say that jurisdiction lies in a court of appeals to review every EPA action taken under the Act,[51] nor do we suggest that we are empowered to review every experimental use permit issued by the agency. We hold no more than that the record in this case brings it within our jurisdiction under the Act's judicial-review section as this court has previously construed it.

### III. MOOTNESS

■ Both of the experimental use permits at issue expired before this case reached oral argument in this court.[52] On this ground, EPA has moved to dismiss the petition for review as moot.[53] Petitioner, on the other hand, claims [54] that the case falls within the exception to the mootness doctrine for "short term orders, capable of repetition, yet evading review." [55] We agree, and accordingly deny the motion.

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." [56] Since we are precluded from rendering advisory opinions,[57] litigation is nonjusticiable if our determination could not affect the rights of the parties.[58] But a court does not necessarily lack power to review agency action effectuated by a series of short-term orders, although the particular order attacked has expired by its

45. *Id.* at 39,504, 39,505.

46. See text *supra* at notes 7–14.

47. See note 17 *supra* and accompanying text.

48. See note 18 *supra* and accompanying text.

49. The hearings on reconsideration of re-registration of Compound 1080 took place in three cities during a period exceeding three months. "Well over 20,000 pages in hearing testimony and exhibits were generated with dozens of parties actively participating in the proceeding. Over 90 witnesses testified." *Final Decision, supra* note 8, at 3, J.App. 287.

50. Certified Index to Record, *Humane Soc'y of the United States v. EPA,* No. 83–2336 (D.C.Cir.) (filed Apr. 27, 1984).

51. See 7 U.S.C. § 136n(a) (1982), quoted *supra* note 30.

52. The Fish and Wildlife Service's permit ran out on November 18, 1984, and the University's permit on November 21, 1984. Motion to Dismiss, *supra* note 25, at 1.

53. Motion to Dismiss, *supra* note 25.

54. Petitioner's Memorandum in Opposition to Respondents' Motion to Dismiss, *Humane Soc'y of the United States v. EPA,* No. 83–2336 (D.C. Cir.) (filed Feb. 12, 1985) at 5–7 [hereinafter cited as Petitioner's Memorandum].

55. *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283–284, 55 L.Ed. 310, 315–316 (1911).

56. U.S. Const. art. III, § 2.

57. *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214, 217 (1969); *Muskrat v. United States,* 219 U.S. 346, 362, 31 S.Ct. 250, 255, 55 L.Ed. 246, 252 (1911); *Grano v. Barry,* 236 U.S.App.D.C. 72, 75, 733 F.2d 164, 167 (1984); *British Caledonian Airways v. Bond,* 214 U.S.App.D.C. 335, 339, 665 F.2d 1153, 1157 (1981).

58. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413, 415–416 (1971) (*per curiam*); *Aviation Enters. v. Orr,* 230 U.S. App.D.C. 285, 289, 716 F.2d 1403, 1407 (1983) (*per curiam*); *Physicians' Educ. Network, Inc. v. HEW,* 209 U.S.App.D.C. 366, 369, 653 F.2d 621, 624 (1981) (*per curiam*); *Montgomery Envtl. Coalition v. Costle,* 207 U.S.App.D.C. 233, 243, 646 F.2d 568, 578 (1980).

own terms. As the Supreme Court has made clear, the case is not moot when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." [59] The permits implicated here easily meet both prongs of this test.

As granted originally, the permits were to endure for one year only, a period all too frequently insufficient for litigation of serious issues to a conclusion. In *Environmental Defense Fund v. Gorsuch,*[60] for instance, petitioners attacked an EPA decision to defer processing of applications for permits to operate existing hazardous waste incinerators and storage impoundments,[61] but EPA withdrew this ruling just a year after it was made.[62] We held that "[w]hile it is conceivable that a petition to review brought in the future might be expedited, a short-term deferral or suspension similar to the one at issue in this case is likely to evade the court's review even under an accelerated procedure." [63] Similarly, in *Seatrain International, S.A. v. Federal Maritime Commission,* [64] we held that an agency order's term of eighteen months was short enough to invoke the exception.[65] In the instant case, petitioner

sought judicial review of the two experimental use permits just six weeks after they were granted,[66] yet they expired more than three months before oral argument.[67] The one-year life span of the permits simply did not allow completion of the process prior to their demise.

In addition, there has long been a very reasonable expectation that additional experimental use permits for Compound 1080 would issue in the future and that petitioner would challenge them. Indeed, EPA has now awarded over petitioner's opposition four successive permits or renewals to the Fish and Wildlife Service. The first, granted in 1982, was promptly assailed in this court by petitioner.[68] After EPA revoked that permit because the Service was violating its terms, the parties jointly moved to dismiss the petition for review.[69] The second permit, awarded in November, 1983, is the one involved in the present case. A one-year renewal, approved in January, 1985, came under attack in petitioner's separate suit,[70] and the renewal has now been extended to May 8, 1986.[71] And while the University's contested permit expired in November, 1984,[72] its request for renewal has not, so far as we are aware, been denied or withdrawn, but remains in dispute before EPA.[73] This persistent pattern of applications and challenges has thus far kept the controversy very much alive.

**59.** *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350, 353 (1975); accord *Maryland People's Counsel v. FERC,* 245 U.S.App.D.C. 365, 370, 761 F.2d 768, 773 (1985); *Monzillo v. Biller,* 237 U.S.App.D.C. 20, 24, 735 F.2d 1456, 1460 (1984); *Grano v. Barry, supra* note 57, 236 U.S.App.D.C. at 75, 733 F.2d at 167; *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.,* 212 U.S.App.D.C. 122, 129, 659 F.2d 168, 175, *cert. denied,* 454 U.S. 963, 102 S.Ct. 503, 70 L.Ed.2d 378 (1981).

**60.** 230 U.S.App.D.C. 8, 15–17, 713 F.2d 802, 809–811 (1983).

**61.** *Id.* at 10, 713 F.2d at 804.

**62.** *Id.* at 15, 713 F.2d at 809.

**63.** *Id.* at 16, 713 F.2d at 810.

**64.** 194 U.S.App.D.C. 370, 598 F.2d 289 (1979).

**65.** *Id.* at 373, 598 F.2d at 292.

**66.** See Motion to Dismiss, *supra* note 25, at 4.

**67.** See note 52 *supra.*

**68.** Petition for Review, *Humane Soc'y of the United States v. EPA,* No. 82–2436 (D.C.Cir.) (filed Dec. 3, 1982).

**69.** Joint Motion for Dismissal, *Humane Soc'y of the United States v. EPA,* No. 82–2436 (D.C.Cir.) (filed June 3, 1983).

**70.** *Humane Soc'y of the United States v. EPA,* No. 85–1073 (D.C.Cir.) (filed Feb. 4, 1985).

**71.** See note 27 *supra* and accompanying text.

**72.** See note 52 *supra.*

**73.** See Motion to Dismiss, *supra* note 25, at 1 n. 1.

We do not share EPA's view that minor differences between permits and renewals in a series [74] render the exception to the mootness doctrine inapplicable. "[A] controversy concerning an initial permit," we have observed, "may simply continue in the context of succeeding permits." [75] Moreover, EPA's assertion of authority to issue experimental use permits, "by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petition[er]." [76] We conclude that the petition for review is not moot, and now turn to the merits.

## IV. The Merits

■ In its initial brief in this court, petitioner contended that EPA exceeded its statutory power when it approved the permits in suit.[77] That argument was based upon provisions of the Act governing issuance of experimental use permits to "[a]ny person." [78] In response, EPA insists [79] that its action did not rest upon those provisions, but rather upon another prescribing more lenient standards for grants of such permits to a "public or private agricultural research agency or educational institution." [80] Petitioner replies that each permit was unauthorized even when measured by the latter criteria.[81] We accept EPA's position.

The Act establishes different requirements for different classes of applicants

for experimental use permits. Under the Act's general provisions, "[a]ny person may apply to the Administrator for an experimental use permit for a pesticide," [82] but in that event a permit can be issued "only if the Administrator determines that the applicant needs such permit in order to accumulate information necessary to register a pesticide." [83] The Administrator is authorized to "establish a temporary tolerance level for the residue of the pesticide" before awarding the permit,[84] and to set "terms and conditions" and fix a "period of time" for it.[85] There is, however, also a specific statutory exemption from these provisions:

Notwithstanding the foregoing provisions of this section, the Administrator may issue an experimental use permit for a pesticide to any public or private agricultural research agency or educational institution which applies for such permit. Each permit shall not exceed more than a one-year period or such other specific time as the Administrator may prescribe. Such permit shall be issued under such terms and conditions restricting the use of the pesticide as the Administrator may require: *Provided,* That such pesticide may be used only by such research agency or educational institution for purposes of experimentation.[86]

74. EPA asserts that the Service's 1985 permit differs from the one involved here in that baits can be placed at additional sites, existing sites can be increased in size, and different techniques for monitoring bait sites and evaluating animal populations can be employed. Motion to Dismiss, *supra* note 25, at 5.

75. *Montgomery Envtl. Coalition v. Costle, supra* note 58, 207 U.S.App.D.C. at 243–244, 646 F.2d at 578–579.

76. *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1, 8 (1974).

77. Brief for Petitioner at 12–25.

78. See 7 U.S.C. § 136c(a)–(e) (1982).

79. Brief for Respondents at 30–36.

80. 7 U.S.C. § 136c(g) (1982), quoted *infra* text at note 86. EPA also argues that the permits met

the more stringent general statutory requirements. Brief for Respondents at 36–44.

81. Reply Brief for Petitioner at 8–12.

82. 7 U.S.C. § 136c(a) (1982).

83. *Id.*

84. *Id.* § 136c(b).

85. *Id.* § 136c(c). The Administrator is also empowered to "specify that studies be conducted to detect whether the use of [a previously unregistered] pesticide ... may cause unreasonable adverse effects on the environment," *id.* § 136c(d), and to revoke a permit when its terms and conditions are violated or found inadequate, *id.* § 136c(e).

86. *Id.* § 136c(g).

The 1983 letter-orders granting the permits to the Fish and Wildlife Service and the University of California at Davis did not specify which of the two sets of authorizing provisions EPA relied upon.[87] Indeed, a reading of the orders leaves the unavoidable impression that it may have been both. But whatever role this sort of ambiguity might have played in another case, it is unimportant here. Since each of the two applicants met the statutory prerequisites to an exemption, we need not determine whether the Act's general requirements were satisfied as well.

■■■ To qualify for an experimental use permit under the statutory exemption, the applicant need only (1) be a public or private agricultural research agency or an educational institution (2) seeking leave to use the pesticide for experimental purposes only.[88] Given the latitude of agency construction of the Act and the duty of courts to respect it,[89] we think EPA could properly consider the Fish and Wildlife Service—a division of the Department of the Interior

devoting some of its energies to research related to animal husbandry[90]—as a "public agricultural research agency" for purposes of the exemption.[91] And surely the University of California at Davis, as part of the State of California's educational system, is treatable as an "educational institution."

■■■ It is equally evident that the uses of Compound 1080 authorized by the permits were no more or less than "experimentation."[92] Petitioner urges us to accept a narrow definition of the term, restricting it to " 'an act or operation' carried out under conditions determined by the experimenter (as in a laboratory) in order to discover some unknown principle or effect or to test, establish or illustrate some suggested or known truth."[93] But EPA's concept of "experimentation" is obviously simpler and broader, calling for no more than trials which are limited in time and nature, and which are not conducted for commercial gain.[94] An agency's construction of a statute it administers must be accorded

87. See Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. David Trauger, Fish and Wildlife Service (Nov. 18, 1983) (granting experimental use permit to Fish and Wildlife Service), reproduced in J.App. 1; Letter from Herbert S. Harrison, Environmental Protection Agency, to Dr. Walter E. Howard, University of California at Davis (Nov. 21, 1983) (granting experimental use permit to University of California at Davis), reproduced in J.App. 5.

88. See 7 U.S.C. § 136c(g) (1982), quoted *supra* text at note 86. Counsel for EPA states that it is also essential that "the research will not harm humans or the environment." Brief for Respondent at 31, 33. This requirement is found in 7 U.S.C. § 136c(e) (1982) and is reiterated in the regulations promulgated thereunder, 40 C.F.R. § 172.8(a) (1985), but it is one of the prerequisites for issuance of a permit to an "any person" applicant. As we have noted, applicants proceeding under the exemption provision are freed from the requirements imposed by the Act's general provisions on experimental use permits. See text *supra* at note 86. Moreover, the regulations set forth in 40 C.F.R. §§ 172.1–172.11 (1985) were promulgated in April, 1975, before § 136c was amended to include the exemption provision. See Pub.L. No. 94–140, § 10, 89 Stat. 754 (1975). No regulations have been adopted under the exemption subsection, nor has there been any action applying preexisting regulations to exempted applicants, and we

find no indication in the record before us that EPA has created additional requirements for such applicants.

89. See note 95 *infra* and accompanying text.

90. See, e.g., 16 U.S.C. § 742d (1982) (requiring investigations and reports with respect to fish and wildlife matters); *id.* § 742d–1 (requiring studies on effects of chemicals on fish and wildlife).

91. The ambiguity of the 1983 orders in regard to the rationale of the agency's decision, see text *supra* at note 87, disappeared completely when, in granting the latest extension to the Service, EPA made clear that it deemed the Service qualified for the exemption under each set of authorizing provisions. Letter from Steven Schatzow, Environmental Protection Agency, to Dr. Jan E. Riffe, Fish and Wildlife Service (Nov. 6, 1985) at 1. EPA expressly found that the Service is a public agricultural research agency within the meaning of the exemption provision. *Id.*

92. EPA has so found. *Id.*

93. Reply Brief for Petitioner at 11 (quoting Webster's Third International Dictionary 800 (1976)).

94. See Brief for Respondent at 33.

great deference by the courts,[95] and we perceive no inconsistency between EPA's interpretation of "experimentation" and the legislative history of the Act.[96] We thus are obliged to accept the agency's reading,[97] and to reject petitioner's claim [98] that the agency's action falls short of the Act's demands.[99]

The orders under review are accordingly

*Affirmed.*

**95.** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844 & n. 14, 104 S.Ct. 2778, 2782 & n. 14, 81 L.Ed.2d 694, 704 & n. 14 (1984); *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268, 283 (1980); *Illinois Commerce Comm'n v. ICC,* 242 U.S.App.D.C. 197, 202, 749 F.2d 875, 880 (1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985); *National Wildlife Fed'n v. Gorsuch,* 224 U.S.App.D.C. 41, 51, 693 F.2d 156, 166 (1982).

**96.** See S.Rep. No. 452, 94th Cong., 1st Sess. 15 (1975) U.S.Code Cong. & Admin.News 1975, pp. 1359, 1372; H.R.Rep. No. 497, 94th Cong., 1st Sess. 27–28 (1975).

**97.** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, supra* note 95, 467 U.S. at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704 (1984); *United States v. Shimer,* 367 U.S. 374, 381–382, 81 S.Ct. 1554, 1560–1561, 6 L.Ed.2d 908, 914 (1961).

**98.** See Reply Brief for Petitioner at 10, 12.

**99.** Petitioner contests EPA's action on the additional ground that the agency failed to include certain materials in the record before us. We need no consider this argument, for the alleged deficiency could affect judicial evaluation of the agency's action only under the "any person" standard.